**UNITED STATES of America, Appellee,**

v.

**Joseph MAURO, Defendant-Appellant.**

**No. 1051, Docket 74–1270.**

United States Court of Appeals, Second Circuit.

Argued May 3, 1974.

Decided June 26, 1974.

Certiorari Denied Oct. 29, 1974.
See 95 S.Ct. 235.

John D. Gordan III, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., S. Andrew Schaffer, Asst. U. S. Atty., of counsel; Michael C. Eberhardt, Sp. Attorney, U. S. Dept. of Justice, on the brief), for appellee.

Arnold E. Wallach, New York City, Aaron Schacher, Brooklyn, N. Y., for defendant-appellant.

Before WATERMAN, FRIENDLY and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

Joseph Mauro appeals from a judgment of conviction which was entered on January 30, 1974, in the United States District Court, Southern District of New York, after a jury trial conducted before Hon. Robert J. Ward, United States District Judge. Mauro was convicted of conspiracy to dispose of cashiers' checks stolen from the First National City Bank in violation of Title 18, United States Code, Section 371, and of possession of the stolen cashiers' checks in violation of Title 18, United States Code, Section 2113(c).

Mauro's associates in the criminal venture at issue were Pasquale Cocco and Bruce Romanoff, both of whom have pleaded guilty to the conspiracy count and have been respectively sentenced to prison terms of eighteen months and six months. Mauro was sentenced by Judge Ward to concurrent terms of two-and-one-half years imprisonment on each count. He is at liberty pending this appeal.

Villano, an undercover agent of the FBI, met with Cocco on February 9, 1973, at a "social club" in Brooklyn, purporting to be interested in having Cocco dispose of some stock certificates which Villano gave him. Cocco told Villano that he was in possession of checks stolen from the First National City Bank as well as other stolen securities.

At a second meeting on February 13th, Villano was accompanied by Oldsberg, who was cooperating with the FBI and who was introduced by Villano as his banker. Cocco brought Villano to his apartment where he returned the stock certificates given to him by Villano stating that they were worthless. Villano then asked Cocco if he could handle counterfeit money and also stated that his banker was willing to handle the stolen cashiers' checks. Cocco was unwilling to do business without his partner and drove with Villano and Oldsberg to Mauro's home in Brooklyn about a mile away. Cocco left the car and returned with Mauro. After some discussion in the automobile about disposing of the counterfeit bills, Cocco stated that he and his partner Mauro had four cashiers' checks stolen from the First National City Bank, each in a face amount of over $2 million, totalling $10 million. Both Cocco and Mauro stated that the forgeries were perfect. Mauro inquired as to how much would be obtained for the checks and stated that their terms were that Cocco and he were to split 2½ percent of the face value of the checks and that their boss was to get 23 percent. Mauro further inquired as to when they could expect to be paid their share. It was agreed that Villano and his principal would meet the "boss" at a Manhattan restaurant on February 16th and see the stolen checks. At that meeting, Cocco appeared without his boss or Mauro but with a xerox copy of one of the checks. Cocco said that the matter had to be handled discreetly and that he would have to discuss the situation again with Mauro.

Finally, another meeting was fixed for February 27th at the same Manhattan restaurant, where Cocco appeared with his boss, Romanoff. Although Mauro was not then present, the percentage arrangement among Cocco, Mauro and Romanoff was again discussed. Cocco went to Romanoff's car, removing a briefcase which he brought into the restaurant. Romanoff took from the brief case three stolen cashiers' checks, each made out in an amount exceeding $2.6 million with forged signatures. While Romanoff was offering the checks for examination, surveilling FBI agents came into the restaurant on signal, arresting Romanoff and seizing the checks.

Although Mauro did not appear at the meeting at which the arrest and seizure of the checks took place, the testimony of his prior meeting with Villano and Oldsberg clearly established his partnership with Cocco, his knowledge of the existence of the stolen checks, and his financial stake in the proceeds of the venture. The argument on appeal that the evidence was insufficient to establish that Mauro was a participant in the

conspiracy is not persuasive and need not delay us.

The only significant question of law raised on this appeal, but never raised below, is Mauro's argument that he could not be convicted of conspiracy since he did not know that the deposits of the First National City Bank were insured by the Federal Deposit Insurance Corporation. The Government concedes that no evidence of such knowledge was offered, although it did establish that the bank's deposits were in fact insured by the F.D.I.C. at the time of the theft.

Mauro was indicted for a conspiracy to violate Title 18, United States Code, Section 2113(c), which provides:

Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value knowing the same to have been taken from a bank, credit union, or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker.

Subdivision (b) referred to in § 2113(c) provides:

Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both; or

Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value not exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

The term "bank" used in subdivisions (b) and (c) is defined in subdivision (f) as follows:

As used in this section the term "bank" means any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, and any bank the deposits of which are insured by the Federal Deposit Insurance Corporation.

The banking institutions covered by subdivision (f) fall into three categories: (1) member banks of the Federal Reserve System; (2) banks organized or operating under the laws of the United States; and (3) banks whose deposits are insured by the F.D.I.C. See King v. United States, 426 F.2d 278, 279 (9th Cir. 1970). It also appears that some overlap exists. Thus, state and national banks may be members of the Federal Reserve System. See 12 U.S.C. §§ 221, 222, 321 & 501a. Moreover, both state and national banks may be insured by the F.D.I.C. whether or not they are members of the Federal Reserve System. See 12 U.S.C. §§ 1814–1815.

■ The second paragraph of the first count in the indictment here states:

It was part of said conspiracy that the defendants would receive, possess, barter, sell and dispose of property, money and things of value exceeding $100, to wit, three cashiers' checks made out in the total amount of $8,410,000, knowing the said checks to have been unlawfully taken and carried away from the First National City Bank, Broadway and 56th Street, Manhattan, New York, the deposits of which are insured by the Federal Deposit Insurance Corporation.

The description of the bank as the First National City Bank is, in our view, sufficient to identify it as one organized or operating under the laws of the United States and thus within the purview of § 2113(b), (c) & (f). In Byers v. United States, 175 F.2d 654 (10th Cir. 1949), a comparable case (although one of substantive crime and not of conspiracy)

involving 12 U.S.C. §§ 588a & 588b (1940), predecessors of § 2113, a motion to vacate a judgment of conviction was made on the ground that the indictment was legally insufficient, vague and indefinite because the banks involved were simply described as the "First National Bank, LeRoy, Kansas" and the "First National Bank, Howard, Kansas." In denying the motion the court stated:

> [T]hese indictments are sufficient no matter by what standard they are gauged. An indictment is sufficient under this statute if it shows, among other things, that the bank is one organized and operating under the laws of the United States . . . . The instant indictments are sufficient under the above test. The name of each bank set out in the indictment contains the word "National" in the title. Only banks organized under the laws of the United States may use the word "National" in their title. [See 18 U.S.C. § 709.] And courts will take judicial notice of the fact that a bank with the word "National" in its title is one organized pursuant to the laws of the United States.

175 F.2d at 656.

■ It is further clear that it was not at all necessary to allege in the indictment that the deposits of First National City Bank were insured by the F.D.I.C. Since it was a national bank, it was already within the coverage of § 2113(c) & (f). Schoepflin v. United States, 391 F.2d 390, 396 (9th Cir.), cert. denied, 393 U.S. 865, 89 S.Ct. 146, 21 L.Ed.2d 133 (1968); United States v. Harper, 241 F.2d 103, 105 (7th Cir. 1957); United States v. Jones, 327 F.Supp. 1208, 1209 (W.D.Pa.1971). While the Government may certainly rely on more than one basis for jurisdiction in a prosecution under § 2113, see King v. United States, *supra,* 426 F.2d at 279; cf. United States v. Cioffi, 487 F.2d 492, 499 (2d Cir. 1973), the additional allegation as to the F.D.I.C. was unnecessary, and since no prejudice arises from its inclusion, it may be properly disregarded. See United States

v. England, 480 F.2d 1266, 1269 (5th Cir.), cert. denied, 414 U.S. 1041, 94 S. Ct. 543, 38 L.Ed.2d 332 (1973); United States v. Archer, 455 F.2d 193, 194 (10th Cir.), cert. denied, 409 U.S. 856, 93 S.Ct. 135, 34 L.Ed.2d 100 (1972); Milentz v. United States, 446 F.2d 111, 114 (8th Cir. 1971); United States v. Goodwin, 440 F.2d 1152, 1157 (3d Cir. 1971); Gawne v. United States, 409 F.2d 1399, 1402–1403 (9th Cir. 1969), cert. denied, 397 U.S. 943, 90 S.Ct. 956, 25 L.Ed. 2d 123 (1970).

■ The fact remains that the Government, which introduced evidence of F.D.I.C. insurance, did not attempt to prove that the First National City Bank was a national bank. However, as suggested in Byers v. United States, *supra,* we can take judicial notice of the fact that the bank was a national bank. In King v. United States, *supra,* there was, like here, nothing to show that the trial court had taken judicial notice of the fact that a branch of the Bank of America was within any of the three criteria of § 2113(f), and that court, on an appeal from a conviction of bank robbery, did remand for an evidentiary hearing limited to the issue of the bank's national character, noting: "We do not decide, however, whether circumstances could be stated under which it would be appropriate for a court of appeals to take judicial notice of the national character of a bank." 426 F.2d at 279. We think these circumstances exist here since, like *Byers* and unlike *King,* the bank was identified in the indictment as the "First National City Bank." See Gold v. United States, 378 F.2d 588, 592–593 (9th Cir. 1967); United States v. Ricciardi, 357 F.2d 91, 96–98 (2d Cir.), cert. denied, 385 U.S. 814, 87 S.Ct. 35, 17 L.Ed.2d 55 (1966); Jordan v. United States, 345 F.2d 302, 304 (10th Cir. 1965); United States v. Pecora, 267 F. 2d 512, 515–516 (3d Cir. 1959). For over a hundred years it has been considered false advertising and unlawful to use the word "national" in the name of any banking institution not organized or operating under the laws of the United

States. See Act of March 3, 1873, ch. 269, § 3, 17 Stat. 603, as amended 18 U. S.C. § 709. Moreover, since September 8, 1959, persons joining to establish a national bank must include the word "national" in its name. Pub.L. 86–230, § 25, 73 Stat. 466, codified at 12 U.S.C. § 22.

There remains, however, the question of the intent necessary to sustain a conviction for a conspiracy to violate § 2113(c). Here, the trial judge instructed the jury that in order to convict they had to find beyond a reasonable doubt that Mauro knowingly entered into an agreement "to possess, sell and dispose of cashier checks of a value of eight million four hundred ten thousand dollars, knowing the said checks to have been unlawfully taken from the First National City Bank."

■■ The finding of guilt here pursuant to the trial judge's charge, to which no exception was taken, is amply established in the record. Mauro not only knew that these were cashiers' checks of the First National City Bank, but he also knew they were stolen; he knew that the payee's name had been forged, and he boasted of the quality of the forgery; he knew the face amount of the checks because he insisted that the 2½ percent cut he and his partner Cocco would share would be based on that amount. Even assuming that as a

conspirator he had to have knowledge of the "national" character of the bank, we hold that this element of the crime was established by his knowledge that the bank was the "First National City Bank." If the national character of the bank had to be established by a defendant's literal knowledge that the bank was "organized and operating under the laws of the United States," precious few bank robbers or receiver conspirators would ever be convicted. No case has ever so held, and, in fact, the only cases in which the question has arisen, although in jurisdictions not sharing our line of authority under United States v. Crimmins, 123 F.2d 271 (2d Cir. 1941), see *infra,* have been to the contrary.[1]

In sum, even assuming that the national character of the bank is an element of intent rather than simply a jurisdictional fact, we are satisfied that it was established here.

The Government has not made this argument on appeal. Since it is clear that no effort was made below to establish that the appellant knew that the bank was insured by the F.D.I.C., the Government urges that no such specific intent is required to prove a conspiracy to violate § 2113(c), but further seems committed to the proposition that this requires us to overrule United States v. Crimmins, supra, and its rapidly increasing tribe.[2] The decision which we

1. In Nelson v. United States, 415 F.2d 483 (5 Cir. 1969), cert. denied, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970), the Fifth Circuit held that in a prosecution for conspiracy to possess property stolen from an F.D.I.C. insured bank, it is not necessary for the Government to prove that the defendant had knowledge of the bank's federal connection. The court stated that "[K]nowledge of receiving money stolen from a banking institution is sufficient to meet the substantive requirements of § 2113(c). Proving that the bank was insured by the F.D.I.C. is simply an additional element of jurisdictional proof which must be shown by the Government at the trial." 415 F.2d at 486. See also United States v. Gallishaw, 428 F.2d 760 (2d Cir. 1970); Lubin v. United States, 313 F.2d 419 (9th Cir. 1963).

With respect to the substantive crime defined by § 2113(c), while the courts have required proof that the defendant had knowledge that the property was stolen from a bank, credit union or savings and loan association, there is no suggestion in the cases that he must also be aware of the institution's federal character. See United States v. Hamilton, 457 F.2d 95 (3d Cir. 1972); United States v. Whitney, 425 F.2d 169 (8th Cir.), cert. denied, 399 U.S. 935, 90 S.Ct. 2267, 26 L.Ed.2d 808 (1970); United States v. Licausi, 413 F.2d 1118 (5th Cir. 1969), cert. denied, 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970).

2. Recent cases in this circuit recognizing the *Crimmins* rule include United States v. Rizzo, 491 F.2d 1235 (1974) (per curiam); United States v. Cangiano, 491 F.2d 906

have reached makes the exercise unnecessary. In our view, the strict view of *Crimmins* was complied with, whether necessary or not.

█ The position that *Crimmins*' invariably mandates that the Government establish the "federal" element as part of the *mens rea* of the conspirator, no matter what the statute he is accused of conspiring to violate, is not persuasive. Certainly there is no rule that the criminal intent required to satisfy a conviction of conspiracy to violate a statute must be greater than that necessary to commit the substantive crime. It cannot be less, but it need not be more. Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1958); United States v. Schwartz, 464 F.2d 499, 510 (2d Cir. 1972), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L. Ed.2d 302 (1973).

█ While the knowledge of a conspirator of the use of interstate commerce, a material and physical reality, may be readily susceptible of proof, the legal status of a banking institution (e. g. membership in the Federal Reserve, chartering by the state or the United States, insurance of deposits by the F. D.I.C.) involves more recondite areas not normally within the ken of those who undertake the activity sought to be discouraged. We would seriously doubt that Congress ever intended that knowledge of these legal and financial relationships must be proved as part of the defendant's intent before he can be found guilty of conspiracy to violate the statute. This "federal" status seems to have been inserted in the statute only to create federal jurisdiction and not as an element of the *mens rea* of the conspirator. We do not pursue the matter further not only because of the position we have taken on the facts of this case, but

also because on petition by the Government, the Supreme Court granted certiorari to this circuit in United States v. Feola, 416 U.S. 935, 94 S.Ct. 1932, 40 L. Ed.2d 285, 42 U.S.L.W. 3584 (1974) to consider our decision in United States v. Alsondo, 486 F.2d 1339 (2 Cir. 1973). This very issue is raised in that case, and we can therefore assume that the integrity of *Crimmins* and the legitimacy of its offspring will be determined by a higher tribunal.

Affirmed.

(1974); United States v. Houle, 490 F.2d 167 (1973); United States v. De Marco, 488 F.2d 828 (1973); United States v. Alsondo, 486 F.2d 1339 (1973), cert. granted sub nom. United States v. Feola, 416 U.S. 935, 94 S.Ct. 1932, 40 L.Ed.2d 285, 42 U.S.L.W. 3584 (1974); United States v. Jacobs, 475

F.2d 270, cert. denied, 414 U.S. 821, 94 S.Ct. 131, 38 L.Ed.2d 53 (1973); United States v. Fields, 466 F.2d 119 (1972); United States v. Vilhotti, 452 F.2d 1186 (1971), cert. denied, 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972).