**UNITED STATES of America, Appellee,**

v.

**Theodore KOSS et al., Defendants-Appellants.**

**Nos. 153, 234 and 480, Dockets 74–1878, 74–1879 and 74–1920.**

United States Court of Appeals, Second Circuit.

Argued Sept. 25, 1974.

Decided Nov. 15, 1974.

Certiorari Denied March 17, 1975. See 95 S.Ct. 1402.

Certiorari Denied April 14, 1975. See 95 S.Ct. 1565.

1104

Richard Wile, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., and John D. Gordan III, Asst. U. S. Atty., S. D. N. Y., on the brief), for appellee.

N. George Turchin, New York City (Morris Weissberg, New York City, on the brief), for appellants Theodore Koss and Koss Securities.

Lawrence Stern, New York City (Edward S. Panzer, New York City, on the brief), for appellant Erwin Layne.

Before LUMBARD, FEINBERG and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Theodore Koss, Koss Securities Corporation, Erwin Layne, and William McGee appeal from judgments of conviction for mail fraud and other offenses related to the sale of stock in Automated Information Systems, Inc. (AIS) entered on June 14, 1974, in the Southern District, following a thirteen-day trial before Judge Charles M. Metzner and a jury. Each appellant was convicted of conspiring to violate the federal securities and mail fraud laws, 18 U.S.C. § 371, and of committing fraud in the purchase and sale of securities, 15 U.S.C. §§ 78j(b), 78ff, and mail fraud, 18 U.S.C. §§ 1341, 1342. In addition, Koss and Koss Securities were convicted of fraud in the offer and sale of securities, 15 U.S.C. §§ 77q, 77x, and of failing to deposit proceeds from an "all or none" offering promptly in an escrow account, 15

U.S.C. §§ 78o(c) (2), 78ff; 17 C.F.R. § 240.15c2–4(b).[1] Koss was also found guilty of submitting false documents to the Securities and Exchange Commission (SEC) in the course of its investigation. 18 U.S.C. § 1001.[2]

The indictment, filed on September 25, 1973, named the appellants and twelve others as defendants. In addition it named seven unindicted individuals and corporations as co-conspirators, including Michael Hellerman, the principal government witness, and Murray Levine, who also testified for the government. Nine of the defendants pleaded guilty before trial; of them Stephan Zardus, Robert Santis, Steven Adlman, and Robert Kolbert testified for the government. Of the three remaining defendants, besides appellants, the jury acquitted Stephen Hagler, and the court granted a severance to Samuel Weisman and Harold Lassoff.

Appellants raise numerous issues in challenging their convictions.[3] We find the various claims to be without merit, and we affirm the judgments of conviction.

## I.

▮▮▮ Appellants Koss and Koss Securities Corporation challenge the sufficiency of the evidence. We find that the record viewed, as it must be, in the light most favorable to the government, United States v. Glasser, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Arroyo, 494 F.2d 1316 (2d Cir. 1974); United States v. McCarthy, 473 F.2d 300, 302 (2d Cir. 1972), amply supports the jury's verdict.

In late 1970 Koss and Koss Securities made an agreement with Robert Santis, the president and owner of AIS, to undertake the public offering of 65,000 shares of AIS common stock at one dollar per share. Koss was to receive fifteen percent of the proceeds, ten percent as commission and five percent for expenses. Santis was trying to raise capital for his small, computer consulting company which had just earned a small profit in its second year of operation. The underwriting was on an "all or none" basis: the moneys would be returned to subscribers and no commission paid to Koss unless all the shares were

---

1. Rule 15c2–4(b) provides:

 It shall constitute a "fraudulent, deceptive or manipulative act or practice" as used in section 15(c)(2) of the Act, for any broker or dealer participating in any distribution of securities, other than a firm-commitment underwriting, to accept any part of the sale price of any security being distributed unless:

 \* \* \* \* \*

 (b) If the distribution is being made on an "all-or-none" basis, or on any other basis which contemplates that payment is not to be made to the person on whose behalf the distribution is being made until some further event or contingency occurs, (1) the money or other consideration received is promptly deposited in a separate bank account, as agent or trustee for the persons who have the beneficial interests therein, until the appropriate event or contingency has occurred, and then the funds are promptly transmitted or returned to the persons entitled thereto, or (2) all such funds are promptly transmitted to a bank which has agreed in writing to hold all such funds in escrow for the persons who have the beneficial interests therein and to transmit or return such funds directly to the persons entitled thereto when the appropriate event or contingency has occurred.
 17 C.F.R. 240.15c2–4(b).

2. Koss was sentenced to imprisonment for one year for conspiracy. Imposition of sentence on the other counts was suspended, and Koss was placed on probation for three years. Koss Securities Corporation was fined $2,500 for conspiracy, with sentencing on the other counts suspended. Layne received a one-year sentence for conspiracy, such sentence to run concurrently with an existing four-year sentence presently being served, but not to begin until December 4, 1974, the date Layne would otherwise be eligible for parole. Sentencing on the other counts was deferred. McGee was sentenced to jail for three months and to two years of probation, with sentencing suspended on the other counts.

3. By order of this court, appellant McGee has been permitted to adopt the briefs and oral arguments of his co-defendants on this appeal. He has filed no briefs on his own, nor did he have his own counsel appear at oral argument.

sold by a certain date. All of the proceeds Koss received from the sale of shares were to be deposited promptly in an escrow account pending completion of the offering, as required by SEC rule 15c2–4 and as indicated in the offering circular.

The offering circular became effective on December 2, 1970. During December Koss was unable to sell more than 15,000 shares. He began to receive payments in December, but did not open an escrow account until December 30, 1970, when he deposited $3000—comprised not of customers' checks for AIS shares, but $2875 from Koss Securities' own account at Shearson, Hammill, another brokerage firm, and $125 from the firm's own bank account. Although it was not clear when Koss received all the proceeds from the sale of the 15,000 shares, since some customers may have delayed payment until near the expiration date of the offer on March 2, 1971, Koss continued to receive payments in January and February. However, after the December 30 deposit, no deposit was made to the escrow account until March 5, 1971, several days after the offering was completed.

On February 1, 1971, Interstate Equity Corporation, headed by Stephan Zardus, was added as a co-underwriter and the offering circular correspondingly amended. Zardus, however, was able to place less than 4000 additional shares.

At that point Murray Levine, who had recently been an employee of Koss Securities and knew of Koss' difficulties in disposing of the stock, contacted Michael Hellerman and Murray Taylor, who agreed to sell the remaining 45,600 shares on two conditions: that they receive one-half of the proceeds of the offering, and that they be given complete control over all 65,000 shares so that the market could be manipulated. This required Levine to convince Koss to recommend to his customers that they sell their AIS stock to Hellerman soon after the offering was completed. Hellerman told Levine that he would pay $1.50 for

those shares at that time—a profit of fifty cents per share for Koss' customers.

Levine and Koss thereafter both told Santis that a group had been found to complete the offering. At a mid-February meeting with Levine, Taylor and Hellerman, Santis reluctantly agreed to the kickback arrangement, fearing that without the assistance of Taylor and Hellerman the offering would fail and AIS would receive no new capital. Santis and Levine also gave the required assurances that Koss would turn over the 15,000 shares at $1.50 per share.

Koss' involvement at that point was somewhat unclear. His later statement to Hellerman that he wanted to "renegotiate" suggests that he did promise Levine before this February meeting that he would turn over the shares at $1.50 per share to the new group. In any event, Koss, if not already, was soon well aware that the group completing the offering was involved in some kind of fraud. After Santis' first meeting with Hellerman, Santis called Koss several times to say that the group wanted the shares. Koss replied that he would not turn over control of the shares until he knew exactly what the deal was, who was involved, and what his participation would be.

Meanwhile Hellerman formed a partnership for the AIS promotion with Taylor and appellant Layne. By February 26, four days before the offering would have expired, the group had sold the remaining 45,600 shares. They purchased 27,600 of the shares themselves in the names of acquaintances and names taken from the telephone book. The cost of the purchases would be more than offset by the kickbacks they were to receive. On February 26, Hellerman and Taylor met with Santis and Zardus and gave them the names of most of the purchasers they had "found," as well as the payment for all the shares. Zardus was to send confirmations only to the legitimate purchasers.

Immediately after that meeting, Zardus called Koss and told him that the of-

fering was going to be successful because of the involvement of Hellerman and Taylor. Zardus also stated that he was accepting a reduced commission because Santis had agreed to kick back one-half of the proceeds of the offering to Hellerman and Taylor. Koss now knew, before the offering was completed and any shares had been issued, not only that the group Levine had found planned to manipulate the post-offering market in the stock, but that AIS would receive substantially less capital than the offering circular indicated.

Koss went along with the Hellerman group and did nothing to have the offering circular amended in spite of his affirmative duties as an underwriter to the investing public. Instead he jockeyed to gain a share of the profits from the manipulation. When the offering was completed he delayed paying AIS the proceeds from the 15,000 shares that he had sold, and he still resisted turning over control of the 15,000 shares to the group. He continued to ask Santis what the deal was and what his participation would be. Finally, on March 5, he wired $9,800 from his firm's bank account to the escrow account, and on March 10 paid AIS $12,500 from the escrow account. That amount represented the proceeds from the 15,000 shares, less Koss' commission and expense allowance of fifteen percent. The balance of the proceeds from the sale of AIS stock was never deposited to the escrow account.

Santis kicked back to the Hellerman group $31,000 and also gave them a $10,000 "loan" to finance the early stages of the manipulation. Zardus received a $1500 commission. In the end AIS received no more than $20,000 from the offering, although the offering circular had represented the net proceeds as approximately $55,000.

The post-offering efforts to get control of the shares of Koss' customers and to drive the price up began in April. Zardus was told by Hellerman that Koss would be calling him to sell AIS shares, and Koss did call shortly thereafter to sell 2,000 shares at $1⁵⁄₁₆. But Koss also made sales to other brokers, which interfered with Hellerman's plans, and this precipitated a confrontation with Hellerman in Miami on April 12. Hellerman accused Koss of violating his agreement with Levine; Koss said he wanted to "renegotiate." He said he knew that there was going to be a big "jiggle" in the stock and he insisted upon keeping some AIS shares, rather than turning them all over at $1.50 per share. An agreement was reached that Koss could retain 5,000 shares, to be sold later at higher prices but only in proportion to the Hellerman group's sale of its shares. Control over the remainder of the 15,000 shares not already sold to other brokers would be turned over to Hellerman at $1.50 per share.

After this meeting Taylor called Zardus and said Koss would be calling to sell shares at around $1.50, which Koss did (3000 shares). Meanwhile Koss Securities purchased at least 2,800 shares for its own account from its own customers, also at $1.50 per share. It recommended sales by its customers even though the firm planned to purchase and hold up to 5,000 shares to take advantage of expected higher prices. Moreover, during this period, Zardus' firm was selling AIS to brokers and customers at prices from $2 to $4 per share.

Koss, who was now in frequent contact with Hellerman, soon complained that Hellerman was not allowing him to sell his shares fast enough, and threatened to "bank the market" (sell all his shares on the open market, thereby lowering the price). Hellerman told Koss to open two accounts and sell 2,500 shares into them immediately. Before payment was made, they had a second confrontation on April 22, partially in the presence of Santis and Zardus. Koss repeated his threats to sell unless he was given a bigger piece of the deal and finally Hellerman agreed to pay Koss $2.50 per share for all Koss' stock, including the 2,500 shares Koss had sold into the two accounts. Layne went to Koss Securities where he picked up 5,000 shares; Hellerman paid Koss

$7,500 in installments, but finally refused to pay the last $5,000 in July.

Koss also performed numerous incidental services for which he was paid. By May 6, Hellerman, Taylor and Layne had sold 21,400 shares (all of which they had purchased in telephone-book names), at artificially high prices of $2 to $5⅛ per share. In order to transfer these certificates to unsuspecting purchasers and to negotiate checks payable to telephone-book "sellers," Hellerman, Taylor, and Layne forged numerous signatures, paid premiums for the cashing of checks with forged endorsements, and secured signature guarantees from brokerage firms for certificates in telephone-book names. Koss was paid one percent of the proceeds of three checks payable to such names and endorsed by Koss Securities, which were cashed at the firm's bank. Koss also bribed an employee of a member of the New York Stock Exchange to affix signature guarantees to certificates made out to telephone-book names. Koss Securities itself guaranteed many such certificates, even though its normal practice was only to guarantee signatures of persons it knew, or its customers.

By late May, the Hellerman group was concerned with unloading its remaining shares at any price. At the suggestion of Robert Kolbert, who was being paid for finding purchasers for the group's stock, appellant William McGee agreed to recommend purchases of AIS to Executive Park Securities, a brokerage firm where he had an account and knew the principal brokers, in return for being paid $100 for every 100 shares Executive Park purchased. This kickback arrangement was not disclosed to Executive Park which purchased over 1,500 shares upon the recommendations of McGee and Kolbert. Hellerman paid $1,500 in two installments to Kolbert, who relayed the funds to McGee.

In June the SEC commenced an investigation, and Koss testified before the Commission on June 15. Also in June, Hellerman and Taylor independently went to the United States Attorney to save themselves by telling much of what they knew. The stock sold for $4⅝ per share on June 21, but a week later it had fallen to twenty-five cents per share.

Koss did not testify at trial. Instead, his wife, who was a partner in Koss Securities, testified regarding the business practices of the firm and her husband's relationship with Murray Levine. Koss also offered character witnesses, plus one witness who had ignored his recommendation to sell AIS. Koss' defense was that he had no knowledge of the fraud, especially before the offering was completed, and that he did not enter into any agreements with Hellerman to raise the price of AIS shares.[4]

Layne did not testify, nor did he call any witnesses. McGee, however, did testify. He admitted recommending AIS shares to Executive Park, although he had denied this when testifying before the grand jury. But he denied receiving $1,500 from Kolbert.

## II.

The government's evidence, as outlined above, was clearly sufficient to support the jury's verdict that Koss and Koss Securities were members of a conspiracy to defraud investors by diverting proceeds of a public offering from AIS, and by driving up the price of AIS shares in the post-offering market and selling the group's own shares to unsuspecting investors at artificially high prices.

Koss knew of the fraud before the offering was completed. His main concern was using his control over the shares he had sold as leverage to secure for himself a substantial share of the

---

4. Koss attempted to impugn Hellerman's credibility by relying on selected business records of the firm to show, for example, that it did not have 5,000 shares in the period when Hellerman said Layne had picked up 5,000 shares at Koss Securities.

profits of the manipulation. His immediate stake in the conspiracy was the receipt of his $2,500 commission for the sale of 15,000 shares, which he otherwise would have lost. Thereafter he was in fact successful in increasing his share of the profits of the manipulation by threatening to sell the 15,000 shares on the open market rather than putting them under Hellerman's control.

Koss acted in furtherance of the conspiracy during the offering by violating his duty as an underwriter to disclose material information through an amended offering circular. Thereafter, he helped Hellerman gain control over the 15,000 shares he had sold, going so far as to buy AIS from his own customers at below the market price. He also bought shares for his firm, at the same time he was recommending sales to his customers.

The evidence also supports the jury's verdict that Koss failed to deposit the proceeds of the underwriting promptly in an escrow account as required by SEC rule 15c2–4. Koss sold 15,000 shares, at one dollar per share, in December, after the offering began on December 2. He did not open an escrow account until December 30, when he deposited $3,000 not directly derived from customers' payments for AIS shares. The government then showed that Koss received two checks in January, and an additional payment in February, and that no deposit was made to the account after December 30 until March 5, 1971, after the offering had been completed. Even then only the net proceeds due AIS from Koss were deposited.

The jury justifiably did not credit Koss' argument that there was no proof that he received more than $3,000 before the very end of the offering in early March. The greatest difficulty with that explanation was that the December deposit would have had to have been in part an advance deposit intended to cover the payments which the government proved Koss received in January and February. However, such an advance deposit would have served no purpose other than to tie up the firm's own funds unnecessarily. Moreover, such an advance deposit seems markedly inconsistent with Koss' attitude toward the account. Koss told Zardus in February not to deposit in escrow a check Interstate had received from an AIS purchaser, because the offering might not be successful. Koss also never deposited a single customer's check to the account, even though there was no reason not to deposit directly checks which were solely in payment for AIS shares. Finally, the jury could have concluded that one reason Koss delayed paying AIS the net proceeds from the 15,000 shares was that the money had been commingled with the firm's own funds and used in its business.

The conviction for submitting false documents to the SEC on June 15, 1971, is supported by the record. The "blue questionnaire" submitted by Koss, which he said represented all the trades of the firm and its customers in AIS, indicated sales to Zardus' firm of only 4,400 shares between April 7 and April 14, 1971, when the evidence at trial was that 5,000 shares had been sold by Koss and Koss customers to that firm. Furthermore, Koss submitted a document which he said contained all the trades in AIS which Koss Securities had made for its own account. Yet Mrs. Koss testified that that document was merely her husband's position sheet and would "mean nothing," to someone looking for all the AIS trades made by the house. The government also showed numerous inconsistencies among Koss' records, especially between those he submitted in June 1971 and those the SEC obtained from the firm in November that year, with regard to trades of AIS shares.

### III.

◼ Koss and Layne seek reversal of their convictions on the ground that the government's use of Michael Hellerman as a witness deprived them of due process of law in that his testimony was incredible, that he masterminded the scheme while under contract with the

government, and that the government improperly rehabilitated him as a witness. We find no error in the use of Hellerman as a witness.

The jury was fully advised regarding Hellerman's relations with the United States Attorney's Office and the crimes he committed before and after he first cooperated with that office regarding his stock-swindling activities. That being so, it was for the jury to decide to what extent, if any, his testimony could be believed. Hoffa v. United States, 385 U.S. 293, 310–312, 87 S.Ct. 408, 17 L. Ed.2d 374 (1966); United States v. Aviles, 274 F.2d 179, 190 (2d Cir.), cert. denied, 362 U.S. 974, 80 S.Ct. 1057, 4 L. Ed.2d 1009 (1960); United States v. Reina, 242 F.2d 302, 307 (2d Cir.), cert. denied, 354 U.S. 913, 77 S.Ct. 1294, 1 L. Ed.2d 1427 (1957). Judge Metzner in his charge fully and fairly cautioned the jury regarding the care it should exercise in evaluating the testimony of an accomplice.

Defense counsel at trial questioned Hellerman intensively and revealed him to be an untiring securities con-artist who, after being barred from the securities industry by the SEC in the early 1960's, reentered it using the brokerage firm Kelsey & Co. as a front, and became a principal participant in at least seven frauds involving the stock of the following corporations: Imperial Investment Corporation, Belmont Franchising, Inc., At Your Service Leasing, Minute Approved Credit, Globus, Computer Microdata, and finally AIS. As an example of Hellerman's skill, he caused the stock in Imperial Investment Corporation, a worthless or "shell" corporation, to go from $1 to $25 per share. Hellerman reported income from these swindles of over one million dollars between 1969 and 1972. He also induced persons on at least two occasions to give false information to the SEC, and he admitted having lied, cheated and bribed continually in the course of his numerous swindles.

Hellerman stated that in November, 1970, he entered into an agreement with the United States Attorney's Office in New York, pursuant to which he agreed to plead guilty to one count of fraud in connection with the Imperial Investment promotion, to give information to the government and to commit no further crimes, in return for nonprosecution for other crimes he had committed. He admitted at trial that he had broken that agreement by subsequently participating in the Computer Microdata and AIS frauds. Furthermore Hellerman admitted lying to the United States Attorney in June 1971 about his own participation in the AIS scheme, in an attempt to place the blame on Taylor. At that time he was instructed to stay out of the deal but to report developments.

Finally, the defense questioned Hellerman about his new agreement with the government, made when his breach of the prior agreement had been discovered. Hellerman had pleaded guilty to two additional counts of fraud and served a total of only nine and one-half months in jail.[5] He also had agreed to testify for the government, in return for nonprosecution for all his other crimes, so long as he testified truthfully.

Appellants do not now come forward with any additional information of perjury or other crimes committed by Hellerman of which the jury was not advised. Thus their reliance on Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1952) is misplaced. In that case the Supreme Court reversed a conviction and ordered a new trial when it was discovered after trial, and called

---

5. Hellerman was sentenced to two years imprisonment for his three guilty pleas in relation to the Imperial Investment, Belmont Franchising, and At Your Service Leasing promotions. However, his sentence was reduced, without a recommendation from the United States Attorney, to time served (nine and one-half months) in September 1973, presumably because of his cooperation with the government in other trials.

As part of this agreement Hellerman also agreed to make restitution of $100,000 to defrauded investors. At the time of trial, he had repaid $12,000.

to the court's attention by the Solicitor General, that the principal government witness had made numerous untrue statements on related matters in other relatively contemporaneous proceedings. Here, however, the jury had before it a full catalogue of Hellerman's misdeeds, double dealings and prevarications.

The government must take its witnesses where it can find them. Few are the fraud cases where the government can prove its charges without calling witnesses like Hellerman who have participated actively in the scheme and profited from the fraud.

It is for the prosecution to make the decision as to who shall be the witness and who the accused. While one cannot help but wonder how much value the government received from the bargain from which Hellerman benefited, the court must leave such decisions to the Department of Justice and leave to the jurors the assessment of the testimony.[6]

From the record before us we can only conclude that the government had no responsibility for Hellerman's part in the AIS stock promotion in the spring of 1971 and that the United States Attorney's Office knew nothing about it until Hellerman, in light of the anticipated collapse of the market in the stock, went to the United States Attorney and told him of the scheme while attempting to play down his own part in it. At no time did the government condone Hellerman's illegal activities or encourage him to participate in any questionable conduct. The fact that Hellerman failed to keep his word to stay out of stock swindles was relevant only to the jury's assessment of his credibility. It is also clear that Hellerman entered

into the AIS scheme on his own and not with the intention of securing information for the government. Instead he went to the government only later when it served his purpose to do so.

 The Hellerman situation parallels that in United States v. Corallo, 413 F.2d 1306, 1320–1321 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L. Ed.2d 422 (1969), where a government informant on other matters entered a particular conspiracy solely on his own and with no intention of securing information for the government. That person's involvement with the government on other matters was found not to make him a government agent for purposes of that particular case. Similarly, as Hellerman was wholeheartedly a member of this conspiracy, his conduct cannot form the basis of an entrapment or due process claim when he later agrees to testify for the government.[7]

We find nothing in this record which persuades us that there could have been a miscarriage of justice because of the role which Hellerman played as a witness. It was as a witness, and only as a witness, that the government used him.

In any event, we note that the participation of the appellants in the AIS manipulation was so abundantly proven by other evidence which corroborated in essential details almost all of Hellerman's testimony that it is difficult to see how the jury could have done otherwise than convict them.

 With respect to the rehabilitation of Hellerman by the government on re-direct examination, it was not error for the trial court to allow the government to introduce the text of Heller-

---

6. It should be noted that Hellerman has testified for the government in six or seven stock fraud cases since entering into his second agreement with the government, including one case, involving Belmont Franchising, recently passed upon by this court. See *United States v. Dioguardi*, 492 F.2d 70 (2d Cir. 1974), cert. denied, — U.S. —, 95 S. Ct. 134, 42 L.Ed.2d 112 (1974).

7. Even if Hellerman had been working for the government, Koss would have no viable entrapment claim since the evidence of his predisposition was overwhelming. Entrapment, in any event, is a jury question, United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1972), yet Koss' counsel did not request that the issue be submitted to the jury.

man's agreement with the government.[8] On cross-examination defense counsel had tried to establish that Hellerman had a motive to testify falsely because of his desire to avoid prosecution for the numerous offenses which he at trial admitted having committed. Introduction of the agreement showed that Hellerman in fact was liable to prosecution for all such crimes if he committed perjury while testifying for the government. It was thus properly admitted as completion of an area only partially explored on cross-examination.

## IV.

 Nor is there any merit to Koss' remaining claims. First, he argues that he was denied his sixth amendment right to be informed of the charges against him. We find, however, that he has failed to demonstrate that the indictment was insufficient, or that the trial judge abused his broad discretion in denying portions of his bill of particulars. *E. g.*, United States v. Salazar, 485 F.2d 1272, 1277–1278 (2d Cir. 1973), cert. denied, 415 U.S. 985, 94 S. Ct. 1579, 39 L.Ed.2d 882 (1974). Koss complains that he was prejudiced as a result of the trial court's order because he did not know before trial that the following would be proved against him: the guaranteeing of forged signatures on stock certificates, knowledge of the kickback from Santis to Hellerman, cashing a forged check for Hellerman, and selling 10,000 shares to Hellerman at around $1.50 per share. However, we find no abuse of discretion, since Koss was informed, among other things, that

he was charged with having joined, in January or February of 1971, a conspiracy of named persons to commit fraud in the offer and sale of AIS securities and to manipulate the post-offering market; that pursuant to this conspiracy Hellerman and Santis worked out a fifty-percent kickback arrangement in the offering; that Koss Securities' transactions in AIS as both principal and agent in the first half of 1971 were part of that manipulation; that he bought stock from his customers below market price; and that numerous checks and stock powers were forged by certain named conspirators and others in the process of carrying out the conspiracy.

 Koss' claim that he was prejudiced by the trial court's exclusion of certain documentary evidence is also without merit. Near the close of trial, and without laying any foundation, Koss' counsel offered, at one time, all Koss Securities' customer account cards to show that Koss had not intentionally submitted false documents to the SEC. The trial judge was acting within his discretion to exclude that evidence when defense counsel did not identify even a single entry which supported the defense. Similarly, cancelled checks payable to customers who sold any stock in their accounts in the summer of 1971 were properly excluded when no attempt was made further to identify what the payments were for.

## V.

 Appellant Layne contends that the trial court's charge to the jury,[9] al-

---

8. All references to organized crime and to threats on Hellerman's life on account of his testimony were deleted from the agreement before it was introduced into evidence.

9. To prove a conspiracy here the evidence must show beyond a reasonable doubt the existence of each one of the following material elements:

 \* \* \* \* \*

 Second, that it was part of the conspiracy to do any one of the following:

 (1) that the defendants and co-conspirators unlawfully, wilfully and knowingly, in

the offer to sell and sale of securities, . . . by the use of the mails, would violate Section 17(a), . . .

 (2) that the defendants and co-conspirators in connection with the purchase and sale of securities, . . . [would use] the mails, to use and employ manipulative and deceptive practices and contrivances in contravention of Rule 10b–5 . . .

 (3) that the defendants and co-conspirators, having devised . . . a scheme and artifice to defraud, . . . would cause to be delivered by mail, . . .

though not objected to at trial, constitutes plain error because it failed to apprise the jury that specific intent to commit particular acts conferring federal jurisdiction, such as use of the mails, is required to convict a person of conspiracy under 18 U.S.C. § 371. See United States v. Alsondo, 486 F.2d 1339, 1343 (2d Cir. 1973), cert. granted sub nom. United States v. Feola, 416 U.S. 935, 94 S.Ct. 1932, 40 L.Ed.2d 285 (1974); United States v. Mauro, 501 F. 2d 45 (2d Cir. 1974), petition for cert. filed, 43 U.S.L.W. 3033 (U.S. July 25, 1974) (No. 74–9); United States v. Crimmins, 123 F.2d 271 (2d Cir. 1941). We do not agree.

Layne complains principally of that portion of the charge which states that to be a member of the conspiracy one need not have full knowledge of its operations, as long as one becomes a member "with full knowledge of its general scope and purposes." We do not read that section as negating Judge Metzner's earlier instruction that the conspiracy must be one to use the mails (or instrumentalities of interstate commerce) in committing the particular fraud charged.[10] Indeed, use of such means seems to be included within the "general scope and purposes" of the conspiracy referred to

certain matter to be sent and delivered by the Post Office Department . . . .
\* \* \* \* \*
You may find that a defendant acted knowingly and wilfully if he acted voluntarily and purposely and with specific intent to do something which the law forbids . . . .
\* \* \* \* \*
It is not required that each of the conspirators participate in or have knowledge of all of the conspiracy's operations. The guilt of a conspirator is not governed by the extent of his participation. He need not know of all the alleged conspirators. Even if a defendant participated in the conspiracy to a degree less than that of his fellow conspirators or in a relatively subordinate or minor way, he is equally culpable, as long as he became a member of the conspiracy with knowledge of its general scope and purposes.

by the trial judge in the very passage relied upon by Layne.[11]

Layne's claim that his conviction should be reversed because of the prejudice accruing from his joint trial with Koss is also without merit. The evidence as to his role in the conspiracy was not so disproportionate in relation to that against Koss and Koss Securities that a severance was required. See United States v. Capra, 501 F.2d 267, 281 (2d Cir. 1974); United States v. Rizzo, 491 F.2d 215, 218 (2d Cir.), cert. denied, 416 U.S. 990, 94 S.Ct. 2399, 40 L. Ed.2d 769 (1974). Moreover, although the trial judge permitted the government to prosecute Koss at the joint trial for submitting false documents to the SEC, after initially severing that count, evidence of Koss' knowing submission of false documents would nevertheless have been admissible to show Koss' consciousness of guilt in regard to the other counts charged. E. g., United States v. Tropiano, 418 F.2d 1069, 1080–1081 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970).

We have considered the other issues raised by the appellants and find them to be without merit.

The judgments of conviction entered below are affirmed.

10. It should be noted that Layne's counsel did not object to this aspect of the charge, and did not call to the trial court's attention any ambiguity which he found in the charge as given.

11. In light of our conclusion, we need not consider the government's argument that 18 U.S.C. § 371 does not in fact require that conspirators intend to commit that act, such as use of the mails, which in fact establishes federal jurisdiction over the substantive crime involved. See United States v. Alsondo, 486 F.2d 1339, 1343 (2d Cir. 1973), cert. granted sub nom. United States v. Feola, 416 U.S. 935, 94 S.Ct. 1932, 40 L.Ed.2d 285 (1974); United States v. Mauro, 501 F.2d 45 (2d Cir. 1974), petition for cert. filed, 43 U.S.L.W. 3033 (U.S. July 25, 1974) (No. 74–9).