UNITED STATES of America,
Appellee,

v.

Milton COHEN et al., Defendants-Appellants.

Nos. 569, 570 and 571, Dockets 74–2026, 74–2027 and 74–2065.

United States Court of Appeals, Second Circuit.

Argued Jan. 20, 1975.

Decided June 26, 1975.

Certiorari Denied Nov. 3, 1975.
See 96 S.Ct. 270, 271.

Gerald A. Feffer, Steven A. Schatten, John D. Gordan III, Asst. U. S. Attys., Paul J. Curran, U. S. Atty., for appellee.

Frederick H. Block, S. Edward Orenstein, New York City, for appellant Cohen.

Marvin B. Segal, Segal & Hundley, New York City, for appellant Deutsch.

Morton S. Robson, Zissu, Lore, Halper & Robson, New York City, for appellant Duboff.

Before WATERMAN, HAYS and MULLIGAN, Circuit Judges.

WATERMAN, Circuit Judge:

Milton Cohen, Bernard Deutsch, and Stanley Duboff were convicted after a seven week jury trial in the United States District Court, Southern District of New York, on all counts of a four count information, filed April 23, 1974, and, on appeal, they seek to have the convictions reversed. Count 1 of the information charged that the defendants and fourteen named co-conspirators conspired in connection with the sale of the common stock of Richard Packing Company, Inc. (hereinafter "Richard Packing") to commit fraudulent acts in violation of various sections of the federal securities laws. Counts 2 and 3 charged the defendants with fraud in the offer and sale of certain securities in violation of 15 U.S.C. §§ 77q and 77x, and with aiding and abetting that fraud in violation of 18 U.S.C. § 2. Count 4 of the information charged the defendants with mailing a false and misleading offering circular for a public offering of Richard Packing common stock in violation of 15 U.S.C. §§ 77j, 77x, 17 Code of Federal Regulations 230.256, and with aiding and

abetting the mailing of a false and misleading offering circular in violation of 18 U.S.C. § 2.

On July 12, 1974 the trial judge sentenced Deutsch to concurrent terms of three years imprisonment on each count, and on July 16, 1974 Duboff to concurrent terms of three years imprisonment on each count, and Cohen to concurrent terms of six months imprisonment on each count.

We affirm the convictions of each of the appellants.

Richard Packing was organized as a Minnesota corporation on July 19, 1967. It was a successor to a partnership organized in January 1967 by appellant Milton Cohen and his brother Henry D. Cohen. Richard Packing was primarily engaged in the business of processing and selling meat and meat products, and Milton Cohen was president of the company and served on its board of trustees. In August 1967 Richard Packing effected an underwritten public offering of 100,-000 shares of its common stock at an initial offering price of $2.25 a share. At the time of this public offering the Cohen brothers owned 375,000 shares of stock, which was restricted and was reserved to Richard Packing management.

In 1968 Milton Cohen began to entertain thoughts of developing Richard Packing into a fast food franchising operation similar to McDonald's Corp., and he enlisted various people to promote this venture. Deutsch and Duboff, who were registered representatives employed by Jaffee & Co., a New York brokerage company, became financial consultants to Richard Packing. A management team of former McDonald employees was assembled. Status Marketing Corporation, a recently formed business, promoted by Richard Packing, whose only client was Richard Packing and on whose board of Directors Milton Cohen served, was entrusted with the dual tasks of developing a marketable franchising package and with the selling of franchises. The fast food franchises were for "Circus Wagon Restaurants", the trade-name developed for the outlets to be built by Richard at franchised locations. Some franchise agreements were closed and good-faith progress deposits made. The relationship between Richard Packing and Status Marketing was generally concealed during this period.

In the first quarter of 1968 the stock of Richard Packing, traded on the over-the-counter market, sold for a high bid price of 5⅝. Thereafter and through the first half of 1970 the stock rose dramatically in value, reaching a high of 53½. A second Regulation A offering of 10,-000 shares of common stock was issued in March 1969. Three affiliated Mutual funds—Financial Dynamics Fund, Financial Venture Fund, and Financial Industrial Fund (hereinafter collectively the Denver Funds)—purchased great amounts of the publicly held shares available for trading and eventually acquired 75% of these shares. Then, during the summer of 1970 the price of Richard Packing shares fell precipitously and the Denver Funds unloaded their shares at approximately $1 a share.

During this same period the business operations of Richard Packing also soured. It had trouble obtaining adequate financing to fulfill real estate and construction contracts for its franchising commitments, and a number of franchise contracts were canceled, requiring return of the cash deposits. In the first half of 1970 Richard Packing was forced to sell some of its meat facilities in order to avoid reporting an operating loss for fiscal 1970. Status Marketing Corporation became bankrupt in early 1970. Notwithstanding these problems, however, Richard Packing advanced over a million dollars to a subsidiary company, Resort Products, which dealt in the leasing of dune buggies.

Throughout this period the defendants were striving to push up the price of Richard Packing stock and to maintain the image of a successful and rapidly developing company. Deutsch in the fall of 1968 interested Hugh Deane, a stockbroker with institutional accounts who was employed by Wood, Walker & Company, in Richard Packing. He accom-

plished this in part by giving earning projections of $1.00 a share in 1969, and $2.50 and $3.00 a share within the next two or three years. Cohen soon afterward confirmed these figures to Deane. In January 1969 Deane grew concerned over a drop in the price of Richard Packing stock, and Deutsch reassured him by reporting to him that there was a large private placement of unregistered and unissued shares which was about to be closed, and "I want the stock at 28 to 30 and ultimately much higher, and I suggest that you buy more and I am going to buy more behind you." Nevertheless, in late 1969 and early 1970 Deane became quite anxious about the financial condition of Richard Packing and he repeatedly called Cohen requesting information from Cohen about the contents of a 1969 annual report, as yet unpublished, and Cohen told him that the report would be forthcoming and that the delay in the report's publication was caused by the accountants.

Meanwhile, in February 1970, Deutsch told Deane:

Don't be concerned, Hugh. Forget the annual report. It is not significant. I have 15 to 20 million lined up to handle the 200 Richard—the circus wagons that we have sold.

In April 1970 Deane received the Annual Report. Richard Packing never received the "15 to 20 million" for financing, nor had 200 Circus Wagon franchises been sold.

From September 1968 until March 1969 Kelly, Andrews & Bradley (KAB), a New York brokerage firm, traded 18,000 shares of Richard Packing stock. Bernard Shwidock was the president of KAB during this period. KAB had opened for business on September 12, 1968 with a purchase of Richard Packing stock on the recommendation of Deutsch and Duboff. In mid-September 1968 Deutsch and Duboff told Shwidock that "we don't give away all this business for nothing" and suggested a 50% kickback on the profits Shwidock was making from its trading in Richard Packing and other stocks. Shwidock later counter-of-

fered a 30% kickback. Deutsch and Duboff accepted the 30% arrangement upon certain conditions: if the trading in the stock was done exclusively by Deutsch or Duboff; if they received at the end of each month their percentages of the net profits made by Shwidock's trading; if KAB engaged in no "front run" orders; and if the arrangement was secret. After this agreement had been made Deutsch or Duboff would telephone Shwidock and tell Shwidock that he had bought Richard Packing at a certain price from a certain broker, or that he had sold stock at a certain price to a certain broker, and Shwidock would then confirm the transaction. KAB made $50,000 from trading in Richard Packing over the next seven months, $15,000 of which went to Deutsch and Duboff. By a subsequent agreement the kickback money was paid to a Switzerland bank which in return provided KAB with worthless investment circulars. Also, Deutsch and Duboff controlled nominee accounts at KAB for Morginstin and Harris, who were Deutsch's brother-in-law and Duboff's father-in-law, respectively. These accounts were the most active accounts at KAB, and the purchases and sales in the accounts were wholly directed by Deutsch and Duboff.

KAB also played a central role in the second Regulation A offering which was effective March 11, 1969. Alvin Malmon, counsel to Richard Packing and a member of its board of directors, prepared the offering circular on information supplied by Cohen. Cohen also reviewed Malmon's final draft. The offering circular stated that the 10,000 share offering was "public," and that it was "not underwritten." The circular also stated that the price per share would depend on the market price of shares at the time of the sale, and that there was "no assurance" that any or all of the offering would be subscribed. All the representations in the circular were shown to be false; arrangements of private placement had been agreed to prior to the offering. Shwidock had met the defendants in New York, and Deutsch had in-

troduced Shwidock to Cohen and identified Shwidock as the man who would send the proceeds of the offering at $28 per share to Cohen at Richard Packing. After this meeting Cohen then sent Shwidock a letter which said in part, "I would appreciate your handling of the sale. We would not expect to get less than $28.00 per share." Duboff directed the placement of the 10,000 shares as follows: 2,000 shares to KAB's trading account; 3,000 to Morginstin and Harris, and 5,000 to Loeb, Rhoades & Co., clearing for Jaffee & Co., for the account of Financial Venture Fund. The bulk of the KAB trading account purchases covered short positions on Richard Packing stock. KAB sent $280,000 to Richard Packing, with KAB having made both trading profits and a commission on the arranged sales of the 10,000 share offering.

KAB began experiencing financial difficulties in March 1969, and from March 1969 Duboff and Deutsch began directing sales through two other New York brokerage firms, V. F. Naddeo and Alessandrini & Co. In December 1969 New Dimension Securities Corp. began business with Deutsch and Duboff as undisclosed principals. Richard Packing had the largest customer account at New Dimension, on which account no trading was done, and Richard Packing's money was eventually returned. Again, Deutsch and Duboff directed the trading in Richard Packing stock, most of which were Jaffee & Co. purchases on account of the Denver Funds. The New Dimension trading profits that were generated through Richard Packing stock transactions exceeded $100,000. These profits in part went to finance lavish expenditures in the purchase and renovation of a New York townhouse, purportedly for New Dimension, but actually for Deutsch and Duboff.

Financial Venture Fund, one of the affiliated Denver Funds, became active in Richard Packing stock in March 1969 shortly after the Fund became operative. It had $45,000,000 to invest in high-risk high-growth companies. The portfolio manager of this fund was Jack Hurley who had earlier been introduced to Deutsch through Hugh Deane. Having confidence in Richard Packing the Denver Funds during the next year purchased 75% of the publicly available stock of Richard Packing, purchasing the stock through their brokerage account at Jaffee & Co. The evidence at the trial showed that the purchases by the Denver Funds were induced by continuing misrepresentations by the defendants of the financial position of Richard Packing. There were repeated overstatements of the number of franchises which had been sold or were being constructed, or were in operation. Deutsch also fed Hurley inflated earnings projections. A report on Richard Packing, prepared by Michael Papworth and not intended for publication, was sent to the Denver Funds. In this report, among other inaccuracies, was the statement that Richard Packing had entered an agreement to acquire a New York meat processing company, though in fact no agreement had been reached to do so, and an acquisition offer by Richard Packing had been rejected by the other company.

The 1969 Richard Packing Annual Report, which did accurately describe the financial condition of the corporation, was never received by the Denver Funds. The report was finally readied by April 1970 and there was conflicting testimony at trial that the report was mailed in either April or July of 1970. In March 1970 Cohen had instructed Bass & Co., the company's public relations firm, that

I want the finished year-end statement to be mailed to Richard Packing Company, 790 So. Cleveland at the cheapest rate of mailing.

We will distribute them to stockholders from this office.

I DO NOT wish this statement to be distributed to any media whatsoever. Only our stockholders are receiving this report and we will do that distributing. Please make sure these instructions are followed to the letter.

Please call me if you have any further suggestions.

The conspiracy count in its two introductory paragraphs identifies the defendants and the co-conspirators, sets forth the two-year period in which the conspiracy occurred, and states the specific statutes allegedly violated. The third paragraph of the count, drawn in the language of 15 U.S.C. § 77q, charges that the defendants and co-conspirators conspired to employ devices, schemes and artifices to defraud, to obtain money and property through material misrepresentations and omissions, and to engage in transactions which operated as a fraud and deceit on purchasers of Richard Packing common stock. The fourth paragraph of the count, drawn in the language of 18 U.S.C. § 1341, charges that the defendants used the mails in the execution of the fraudulent scheme. The next paragraph states that the defendants employed manipulative devices and contrivances in contravention of Rule 10(b)–5 (17 CFR 240.10b–5).

The "means" paragraph of this count adds specificity to these broad allegations. Among the means stated to achieve the ends of the conspiracy were: the control of Deutsch and Duboff over accounts which restricted the available supply of Richard Packing stock and which created the appearance of market activity; the secret kickback arrangement with Shwidock and KAB; the Regulation A offering; the inducement by which Denver Funds purchased Richard Packing through controlled accounts; and the filing and mailing of a false and misleading offering circular. The overt acts, separately stated at the end of the conspiracy count, set forth acts in March 1969 concerning the Regulation A offering; Cohen's letter to Shwidock; the purchases of the stock by KAB and Jaffee & Co.; KAB's issuing of a check; and by a reallegation of the facts stated in Counts 2 and 3 of the information, the mailing of offering circulars and confirmation letters.

It is the contention of the defendants that this information was insufficient to apprise them of what they should be prepared to meet at the trial and to prevent double jeopardy problems in the event of further criminal proceedings against them in the future. See Russell v. United States, 369 U.S. 749, 763–764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). The Government believes that the information was amply sufficient to inform the defendants that they were being accused of engaging in one broad conspiracy purposed to deceive investors and to manipulate the price of Richard Packing Company stock in furtherance of that purpose. This Circuit has consistently held that an indictment which tracks the statutory language and which provides the approximate time and place of the offense can be constitutionally sufficient. United States v. Salazar, 485 F.2d 1272 (1973), cert. denied, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); United States v. Sperling, 506 F.2d 1323 (1974); United States v. Palmiotti, 254 F.2d 491 (1958). In the present case the information provided the defendants with considerably more detail than simply stating the time and place of the offense and quoting the criminal statute; the means paragraph spelled out the kickback scheme, the false Regulation A offering circular; the inducement to the Denver Funds, and the controlled accounts. We agree with the Government's contention. Read in its entirety, the conspiracy count indicates that the defendants were being accused of a broad range of fraudulent activity whose purpose was to deceive the investing public, which in this case was primarily the Denver Funds, and to manipulate the price of Richard Packing common stock for the defendants' benefit. Although the information is far from a model of clarity and precision, we cannot say that the conspiracy count taken as a whole was so deficient as to be constitutionally infirm. It informed the defendants of the broad objectives of the conspiracy and the statutory elements allegedly violated, and it provided considerable detail about the specific activities done in furtherance of the conspiracy. On the basis of the record we can anticipate no conceivable double jeopardy problems arising in the future.

■ The arguments the defendants raise to challenge the sufficiency of the information as to the substantive counts, counts 2, 3, and 4, are wholly without merit. The information in these counts tracks the statutory language, provides precise information of the specific acts, the date of each occurrence, and the persons involved. The second and third counts incorporate by specific reference the "means" paragraph of Count 1; Count 4 incorporates Counts 2 and 3. Without the necessity of a more detailed discussion it is obvious that these counts of the information were sufficiently specific to apprise the defendants of the charges against them so that they could prepare their defenses.

■ Related to their argument that Count 1 of the information was so insufficient that they could not prepare defenses to it, the defendants also claim that there was a prejudicial variance between the conspiracy charged in the information and the conspiracy the Government proved at the trial. The information did not include specific allegations of the following items of evidence introduced at trial: the many oral misrepresentations concerning the projected earnings of Richard Packing, the 20 million dollars "lined up" and the franchise placements, as well as various written misrepresentations contained in press releases, the use of the report prepared by Papworth, Deutsch's and Duboff's involvement in New Dimension, and the timing of the 1969 Annual Report. Compare United States v. Koss, 506 F.2d 1103 (2 Cir. 1974). Cohen's participation in the conspiracy was shown at trial to have been, in no small part, participation in repeated misrepresentations about the success that Richard Packing was enjoying, and these misrepresentations were not all specifically spelled out in the information. However, the Government was, in essence, charging that the defendants conspired illegally to manipulate the price of Richard Packing shares,

and in so doing fraudulently to deceive the investing public. Central to this deception were the material misrepresentations included in the Regulation A offering circular which Cohen helped to prepare and which he reviewed. The many oral misrepresentations by Cohen on such matters as earnings projections, the Status Marketing-Richard Packing relationship, and the placement of franchises were not independent acts separate and apart from the conspiratorial central fraudulent activities and unrelated to them, but were integral to the very core of the overall scheme and in furtherance of that scheme. The Government need not, when charging conspiracy, set out with precision each and every act committed by the conspirators in the furtherance of the conspiracy, Wong Tai v. United States, 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927); Thornton v. United States, 271 U.S. 414, 423, 46 S.Ct. 585, 70 L.Ed. 1013 (1926); United States v. Koss, 506 F.2d 1103 (2 Cir. 1974); United States v. Kenny, 462 F.2d 1205 (3 Cir. 1972) cert. denied [Murphy v. U. S., Kropke v. U. S., Stapleton v. U. S., Kunz v. U. S., Sternkopf v. U. S.], 409 U.S. 914, 93 S.Ct. 233, 234, 34 L.Ed.2d 176 (1972).[1] The information provided enough detail about major fraudulent acts of the three defendants to permit the admission of evidence of related facts shown to be and proved to be in furtherance of the conspiracy.

We hold that Count 1 of the information was constitutionally sufficient to apprise the defendants of the nature of the charges against them, that of conspiring with each other to violate the federal securities and mail fraud statutes through the illegal manipulation of Richard Packing stock. Similarly, as stated *supra*, the arguments that the charges in the information's remaining three counts are constitutionally insufficient are entirely without merit.

■■ Duboff contends that the prejudice he maintains he suffered because of

---

1. By separately-filed petitions five of Kenny's codefendants-appellants, Sternkopf, Kropke, Stapleton, Kunz and Murphy, sought review by certiorari of the affirmances of their convictions. Their separate petitions were denied.

the generality of the allegations in the information was compounded by the failure of the court to grant his pre-trial requests for further particulars. He claims this failure is reversible error. We do not agree. After an informal meeting between counsel for defendants and government counsel on January 14, 1974 counsel for Cohen requested that the court order the Government to furnish further particulars and a pre-trial discovery. A pre-trial conference before the trial judge was then held on February 28, 1974. As a result of these meetings the Government on March 27, 1974 provided all defendants with a bill of particulars, and then later furnished amendments to the bill on April 12, 1974. The bill of particulars supplemented the "means" paragraph of the conspiracy count by setting forth facts concerning the defendants' control of the Morginstin and Harris accounts at KAB; the directing by the defendants of the controlled trading accounts at KAB, New Dimension and V. F. Naddeo; the undisclosed interest of Deutsch and Duboff in New Dimension; and Cohen's control over the Richard Packing trading accounts. Also, the bill of particulars spelled out the information's alleged overt acts in greater factual detail and provided the defense with the names of others involved in the conspiracy who had not been mentioned in the information. Whether a bill of particulars should be provided at all and, if ordered provided, its scope and the extent of its specificity, are matters within the discretion of the trial judge. United States v. Salazar, 485 F.2d 1272 (2 Cir. 1973); United States v. Koss, 506 F.2d 1103 (2 Cir. 1974). We are unable to discover any prejudice to the defendants that could have resulted from what Duboff vaguely states was a failure to provide further particulars. Duboff, himself, at no time formally moved for a bill of particulars, although he states that an oral motion was made at the pre-trial conference before the trial judge. No defendant moved to dismiss the indictment before trial, and the fact that the defendants had complete access to government files makes exceedingly unpersuasive the defendants' claims that they were surprised at trial.

■ Cohen and Duboff argue that there was insufficient evidence to sustain their convictions on all four counts; Deutsch limits his objection to the insufficiency of the evidence to support his conviction on Count 4. We find that the evidence, viewed in the light most favorable to the Government, established an ample basis for the jury to find all three of the defendants guilty beyond a reasonable doubt on each of the four counts charged.

Duboff's and Cohen's arguments that the evidence was insufficient to convict them on the conspiracy count primarily concern their claims that this count of the information was inadequate and the claimed variance between the conspiracy charged in the information and the evidence of conspiratorial activity the Government offered at trial. They urge that their convictions be tested against only that evidence which just tends to prove the narrowest possible construction of the information. We have no difficulty in rejecting such an approach, for the information is sufficient to support a broader interpretation of the conspiracy the Government alleged, a conspiracy which the Government quite handily proved at trial.

The evidence sufficed to show a continuing agreement among the principals to manipulate the price of Richard Packing stock through misrepresentations of the franchising operations of the company, through the directed and controlled trading in the company's shares of stock, and through the inaccuracies contained in the Regulation A offering circular. The trial judge gave clear and proper instructions on the elements necessary to find a conspiracy: the presence of an unlawful agreement; the knowing and wilful participation of a member; the commission of overt acts in the furtherance of the purpose of the unlawful agreement.

As to Cohen, the evidence, taken most favorably to the Government, showed that Cohen provided Deane with inflated

earnings projections and gave him the impression that Status Marketing was an enterprise independent of Richard Packing. He, in connection with his attorney, prepared and reviewed the offering circular which the evidence showed to be a false and misleading one. He participated in, and encouraged, the publication of false and misleading press releases. Throughout the time period of the conspiracy's successful existence he was profiting through the sales of Richard Packing shares of stock. Thus, while Cohen's participation was not as extensive as his codefendants, there was sufficient evidence against him in the case for a jury to find that beyond a reasonable doubt he wilfully and knowingly joined a criminal conspiracy to manipulate the stock of Richard Packing illegally.

As for Duboff, his claim that the evidence was insufficient to convict him must be considered frivolous. There was overwhelming evidence in the record to establish his complicity in the conspiracy. His participation centered on the financial machinations which lay at the very core of the conspiracy.

■ The trial court also fully instructed the jury that they could not convict unless they found the defendants had been engaged in a single conspiracy rather than engaged in separate or multiple conspiracies. Cohen objects that the court's instruction that ". . . if you find that the government has failed to prove the existence of only one conspiracy, you must find the defendants not guilty" was an "all or nothing" charge similar to the one found impermissible in United States v. Kelly, 349 F.2d 720, 757–758 (2 Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). Such instructions have been held proper in recent cases. See, e. g., United States v. Sperling, 506 F.2d 1323, 1341 (2 Cir. 1974); United

States v. Bynum, 485 F.2d 490, 497 (2 Cir. 1973).[2] Cohen points out that the jury would be hesitant to acquit Deutsch and Duboff, anyway, regardless of whether the evidence tended to show a single conspiracy or proved multiple conspiracies, and therefore this instruction forced the jury to convict Cohen as well. This view misconstrues both the evidence and the instructions of the court. The court joined the above-quoted instruction with other instructions, which required the jury to find that Cohen entered the conspiracy wilfully, and which required the jury to consider each defendant's actions individually. In the context of the entire charge the jury, if the evidence had warranted such a result, could have convicted Deutsch and Duboff and acquitted Cohen.

■ Cohen also argues that the evidence does not support the jury's conclusion that there was only one conspiracy. It is true that Cohen's codefendants were pursuing other related fraudulent activities concurrently with their activities in manipulating the price of Richard Packing stock. Even though Cohen did not participate in every one of the other frauds perpetrated by Deutsch and Duboff, or even though he may not have known of the specific details of these extra activities, the evidence showed that Cohen was participating with his codefendants in the continuing scheme to manipulate the price of Richard Packing stock. Cf. United States v. Overton, 470 F.2d 761, 766 (2 Cir. 1972), cert. denied, 411 U.S. 909, 93 S.Ct. 1528, 36 L.Ed.2d 200 (1973). Throughout the trial the court viewed the evidence as limited to proof tending to establish alleged fraudulent activities related to Richard Packing, and repeatedly instructed the jury to limit its consideration to relevant matters. The issues of whether there was a single conspiracy and of Cohen's participation in the fraudulent activities

---

**2.** Certiorari was sought and granted here on grounds unrelated to this language of the charge to the jury. The judgment was vacated and the case remanded to the Second Circuit for further consideration of the unrelated grounds, Bynum v. United States, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). The Second Circuit has reinstated the vacated judgment, 513 F.2d 533 (2 Cir. 1975).

were fairly put to the jury, and this court ought not to disturb the jury's resolution of both issues.

■ Cohen also argues that he was seriously prejudiced by the failure of the trial judge to sever his case from that of his codefendants. Cohen's theory here is similar to his theories advanced to support his earlier points: Deutsch and Duboff were pursuing other frauds in the sale of Richard Packing stock, and the evidence of these other frauds was so fully detailed before the jury that, despite limiting instructions, prejudice. to Cohen was inevitable. Of course the grant or the denial of motions for severance is within the sound discretion of the trial judge, who is in the best position to evaluate the potential for prejudice to the movant, and decision on the motion will rarely be disturbed on review. United States v. Koss, *supra;* United States v. Sperling, *supra;* United States v. Bynum, *supra;* United States v. Cassino, 467 F.2d 610 (2 Cir. 1972), cert. denied, 410 U.S. 913, 93 S.Ct. 957, 959, 35 L.Ed.2d 276 (1973). In this case, although Cohen's complicity was not as extensive as that of his codefendants, nor his acquisitive rapacity as pervasive as that of his codefendants, we cannot say that a severance of his case was necessary to guarantee him a fair trial. The jury could find from all the evidence, and quite correctly did find, that there was a single conspiracy to manipulate Richard Packing stock, and that Cohen was a principal actor in the activities to advance the conspiracy. The fact that Deutsch and Duboff devised methods for securing additional profits for themselves while the conspiracy was in effect by their secret arrangements with KAB and New Dimension, does not detract from the finding that the three defendants were joined in a single scheme illegally to manipulate the price of Richard Packing stock and thereby to defraud the public investors in that stock. Cohen's role in these objectives was central to the success of the conspiracy, and his overall activity was not so disproportionate to that of his codefendants that his

case needed to be severed to assure that he receive justice. United States v. Koss, supra.

■ Deutsch argues that the evidence was insufficient to support convictions on Count 4 of the information which charged the defendants with unlawfully using the mails to transmit false and misleading offering circulars. The use of the mails to transmit false and misleading offering circulars, and to send out confirmation slips of sales resulting from such circulars, was, Deutsch contends, too remote in relation to the scheme to defraud to violate the mail fraud statute, 18 U.S.C. § 1341, and that rather than being an affirmative element of the scheme to defraud, the use of the mails did not further the purpose of the conspiracy but was only an incidental act of the kind which normally accompanies any transaction, but which does not further its purpose or its success. The information, however, does not accuse the defendants of violating the Mail Fraud Statute, but rather of violating certain sections of the securities laws, 15 U.S.C. §§ 77j, 77x, and securities regulation 17 CFR 230.256. These sections set forth the material required to be set forth in an offering circular and require that the circular be provided to persons to whom an offer is made. Section 77x makes wilful violation of the statute or regulation a criminal offense. Reading these sections together, it is apparent that the defendants were not charged with mail fraud under 18 U.S.C. § 1341 but with publishing a false and misleading offering circular. The reference to the use of the mails to carry and transmit these circulars specifies the mode by which the publication was effected. Even if Deutsch's construction of the count were correct, the sending of broker confirmation slips to cover stock transactions, which is alleged in Count 4 through the incorporation in that count of the allegations contained in Counts 2 and 3, is sufficient to sustain convictions under 18 U.S.C. § 1341. See United States v. Marando, 504 F.2d 126 (2 Cir.), cert. de-

nied sub nom. Berardelli v. United States, 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974). Here a principal aspect of the scheme to defraud investors was the activity surrounding the Regulation A offering of 10,000 shares in March 1969. The offering circular was false in material respects. The applicable regulation requires that a written confirmation be sent by the broker, and here these were shown to have been sent through the mails. It was vital to the success of the conspiracy that the appearance of normality be maintained throughout so as to conceal the actual state of affairs. United States v. Marando, *supra*. Any failure to follow the generally accepted procedures in the handling of over the counter stock sales would have perhaps aroused suspicions at a time when the Denver Funds were becoming heavily involved in Richard Packing. The mails were neither "incidental" nor "remote" to the scheme to defraud, but, to the contrary, were rather a necessary and integral step in the furtherance of the scheme.

The defendants also raise numerous additional claims of trial error, arguing that there were occurrences at the trial which were sufficiently grave and had consequences so prejudicial that these errors require a reversal of the convictions and a remand for a new trial. We find, however, from a studious examination of the record, that these objections are so wholly meritless as to deserve no extended discussion. We mention a few of them. Contrary to the assertions of Deutsch, the trial judge performed his duties in commendable fashion, and throughout the lengthy, and at times heated, trial treated the defendants with complete fairness. The instructions of the judge to the trial jury were concise and clear and included all the requisite elements which the jury was required to consider in order fairly to resolve the defendants' innocence or guilt.

The admissions of various items and of certain testimony into evidence, claimed to have been erroneously admitted, were correctly admitted, well within the discretion of the trial judge. For example, Ruth Appleton, Chief of the Branch of Small Issues of the SEC, testified and gave her expert opinion of the reach of the concepts of "underwriter" and "materiality." The admission of this testimony is challenged as having been prejudicial error. It is claimed that this testimony took away from the jury its power to resolve issues of ultimate fact.

Attorney Malmon who had handled Cohen's SEC matters for him and for Richard Packing had on cross-examination been made a defense witness and had previously testified as an expert on similar issues of "ultimate fact." The court recognized the desirability of this type of testimony in this involved case and, while giving properly limiting instructions, admitted such expert testimony into evidence. We hold the admission of such expert testimony, so admitted, was a proper exercise of the trial judge's discretionary power over the progress of the trial.

The trial was long and protracted, it dealt in substantial part with complex questions involving the securities laws. Expert testimony, subject to limiting instructions, was helpful to an understanding of the contested controversial issues requiring factual resolution by the triers-of-fact. Cf. United States v. Brown, 511 F.2d 920, 924 (2 Cir. 1975); United States v. Fernandez, 480 F.2d 726, 740 (2 Cir. 1973).

Convictions affirmed.