**UNITED STATES of America**

v.

**Louis C. OSTRER, a/k/a "Louis Cuple", "Jack Ostrer" and "Rick Kaplan", Rita Ostrer, Seymour Greenfield, and Cy Reeves Snyder, Defendants.**

**No. 78 Cr. 0535 (KTD).**

United States District Court,
S. D. New York.

Nov. 27, 1979.

---

See also, D.C., 488 F.Supp. 540, D.C., 460 F.Supp. 1388.

**410**

Robert B. Fiske, Jr., U.S. Atty. for the Southern District of New York, New York City, for the United States of America; Richard F. Ziegler, Philip Le B. Douglas, Samuel S. Linderman, Asst. U.S. Attys., New York City, of counsel.

Carro, Spanbock, Londin, Fass & Geller, New York City, for defendant Louis C. Ostrer; Jerome J. Londin, Richard H. Wynn, New York City, of counsel.

Gerald L. Shargel, New York City, of counsel, for defendant Rita Ostrer.

Irwin Rochman, New York City, of counsel, for defendant Seymour Greenfield.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge:

Defendants Louis Ostrer, his wife Rita Ostrer, Seymour Greenfield, and Cy Reeves Snyder were indicted by the Grand Jury on July 18, 1978. Count One charges the Ostrers and Seymour Greenfield with conspiracy to evade taxes. Count Two charges Louis Ostrer and Seymour Greenfield with evasion of payment. Counts Three through Seven charge defendants Louis Ostrer, Seymour Greenfield, and Cy Reeves Snyder with conspiracy to embezzle, embezzlement, interstate transportation of stolen money, and racketeering.

The latter Counts arise from defendant Louis Ostrer's activities as "insurance consultant." Through the assistance of the other named defendants, Louis Ostrer allegedly embezzled approximately $1.2 million from Local 918, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America's Employee Welfare and Pension Benefit Funds. The total amount claimed by the government as a result of the tax evasion and embezzlement charges of this indictment is approximately $6.9 million. This total figure includes taxes due and owing from the individual returns of Louis Ostrer and employment taxes of Fringe Programs, Inc. assessed against Louis Ostrer.

Louis Ostrer has made the instant omnibus criminal motion in which defendants Rita Ostrer and Seymour Greenfield have joined. Included therein are various dismissal, suppression, severance, discovery, and miscellaneous motions.

Before discussing the merits of each of the instant motions, which I deny with the exceptions noted below, I note that contained in the voluminous documents and affidavits in this case, there is not one affidavit from Louis Ostrer personally. This is so despite the fact that several of the allegations made herein involve situations of which Louis Ostrer is in a position to have personal, first-hand information. For example, in the motion to dismiss based

on government misconduct, it is alleged that Louis Ostrer was subjected to threats and intimidation to coerce his co-operation as an informer. Yet, there is no affidavit from Louis Ostrer. Also, one of the several motions to suppress alleges that during tax court settlement negotiations for the 1976 tax year, Louis Ostrer was promised by the government that no criminal prosecution would result from any stipulations made in connection with those settlements. Again, a personal affidavit from Louis Ostrer is conspicuously absent.

*Dismissal Motions*

1. Counts One and Two

■ Defendant, Louis Ostrer, has moved to dismiss Counts One and Two on the grounds that they are based on transactions and assessments which were the subject of civil settlements. Furthermore, he asserts that the government expressly represented to him that these settlements would not be the basis for any criminal liability.

I see no evidence of such an agreement between the government and Mr. Ostrer. Moreover, Counts One and Two of the indictment concern evasion of *payment.* Thus, even if the government had agreed not to use the tax settlements as a basis for criminal liability, it is inconceivable that it would have similarly agreed with respect to *enforcement* of the settlement agreements. For these reasons, the motion to dismiss Counts One and Two is denied.

2. Counts Three through Seven

■ Defendants seek to dismiss Counts Three through Seven on the grounds "that the crimes alleged in those counts are 'new domains,' unrelated to the tax investigation for which the Grand Jury was originally convened in January of 1976." Defendant's Notice of Motion, Affidavit of Counsel in Support of Motion, Memorandum of Law to Dismiss Counts Three thru Seven of the Indictment at 1.

The instant indictment was entered by a "special grand jury" empanelled pursuant to 18 U.S.C. § 3331. This grand jury's life was properly extended by the United States Attorney according to the terms of that section.[1] See Exhibit V to Government's Memorandum of Law in Response to Defendant's Pre-Trial Motions [hereinafter referred to as "Government's Memorandum"] (grand jury empanelling and extension orders).

Even if the life of the grand jury was properly extended, defendants argue, based on *United States v. Johnson,* 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943), that the embezzlement and racketeering related offenses were not investigated during the original eighteen month term. They further argue that any investigation of these offenses, allegedly unrelated to the tax offenses, after the original period constitutes, an impermissible entry into a "new domain."[2]

In *Johnson,* the Court was analyzing recent changes in the grand jury statute.[3] In its analysis, the Court indicated that although the grand jury's function has historically, been arbitrarily limited, the purpose for allowing extensions "was to make the grand jury a more continuous and

---

1. Grand juries empanelled pursuant to § 3331 are to serve for eighteen months. At the end of this period, extensions are provided for as follows:

> If, at the end of such term or any extension thereof, the district court determines the business of the grand jury has not been completed, the court may enter an order extending such term for an additional period of six months. No special grand jury term so extended shall exceed thirty-six months, except as provided in subsection (e) of section 3333 of this chapter.

18 U.S.C. § 3331(a).

2. The government concedes that the grand jury did not investigate the evidence resulting in counts three through seven until after the original eighteen month period. Government's Memorandum in Opposition to Defendant Louis C. Ostrer's Omnibus Pre-Trial Motions at 98, n.* It argues, however, that the inquiry into embezzlement related offenses was permissible during the extended life of the grand jury.

3. The Court in *Johnson* was interpreting changes in the old governing statute on grand juries, 28 U.S.C. § 421 (current version in Fed. R.Crim.P 6(a)(g) (revised 1948)).

therefore more competent instrument of what have become increasingly more complicated inquiries into violations of the enlarged domain of federal criminal law." 319 U.S. at 511.

Defining the scope of an extended grand jury's investigation, the Court went on to say that "[the grand jury] is not forbidden to inquire into new matters within the general scope of its inquiry but only into a truly new, in the sense of dissociated, subject-matter." *Id.*

First, it should be noted that *Johnson*, decided in 1943, preceded the "special grand jury" statute, 18 U.S.C. § 3331, which was enacted in 1970. Thus, the decision in *Johnson* was not construing the instant statute and if it is to apply at all, it is by analogy. It is not clear that the limitations in that Opinion should apply to the broad extension provision in § 3331.

This is a question I need not decide, however, for even under the test outlined in *Johnson*, I find that the embezzlement related offenses are not "truly new or dissociated" but were "within the general scope of the grand jury's inquiry." Indeed, as I noted in my Opinion denying the motions of Rita Ostrer and Seymour Greenfield for misjoinder and severance, "the plan to conceal assets that began in 1975 continued through 1978 and included the moneys embezzled from the Union Pension Fund. Viewed in this manner, the indictment does appear to allege participation by both defendants in a common scheme or series of transactions." *U. S. v. Ostrer*, 460 F.Supp. 1388, 1390 (S.D.N.Y.1978). Given the broad scope of potential grand jury inquiry described in *Johnson*, it appears that the embezzlement related charges are sufficiently connected with the tax evasion counts so as not to constitute an impermissible "new domain." To find otherwise would be to inhibit the grand jury function with unnecessary technicalities. Consequently, the motion to dismiss Counts Three through Seven is denied.

3. Count Seven

█ The final Count of the indictment is a charge under the Racketeer Influenced and Corrupt Organizations Act, [hereinafter referred to as "RICO"] 18 U.S.C. §§ 1961 *et seq.* The paragraphs specifically challenged by defendants read as follows:

21. At all times relevant to this indictment, 955 N.E. 125th St. Corp. ("955 Corp.") was a corporation established pursuant to the laws of the State of Florida. 955 Corp. maintained account number 5123895 at the Miami National Bank and this account listed CY REEVES SNYDER and "Jack Ostrer" as President and Secretary, respectively, and both were authorized to sign checks on the account. The corporation was engaged in the business of operating and maintaining an office building at 955 N.E. 125th St., North Miami, Florida, and as such constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), *which enterprise was engaged in; and the activities of which affected, interstate commerce.*

22. From on or about July 28, 1976, and continuing up to the date of the filing of this indictment, in the Southern District of New York and elsewhere, the defendant LOUIS C. OSTRER, a/k/a "Louis Cuple" and "Jack Ostrer," unlawfully, wilfully, and knowingly, did use and invest, directly and indirectly, in the acquisition of an interest in and the operation of the 955 Corp., an *enterprise engaged in, and the activities of which affected, interstate commerce,* income which was received and derived from a pattern of racketeering activity, that is, acts of embezzlement in violation of Title 18, United States Code, Section 664 and interstate transportation of stolen property in violation of Title 18, United States Code, Section 2314.

Indictment No. 78–0535 at 15 (S.D.N.Y. July 18, 1978) (*emphasis added*).

Section 1962(a) requires, as a jurisdictional prerequisite to a RICO charge, that money derived from a pattern of racketeering be used or invested,

directly or indirectly, . . . ., in acquisition of any interest in, or the establish-

ment or operation of, any enterprise which is engaged in or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

Defendants argue that Count Seven is jurisdictionally deficient because it merely asserts, in conclusory terms, that the 955 Corp. is an "enterprise engaged in, [and] the activities of which affect[ed], interstate commerce."

This argument is contrary to the law of this Circuit and, accordingly, the independent motion to dismiss Count Seven is denied. The Second Circuit has consistently held that

> details need not be alleged as long as the indictment furnishes sufficient information as to the time, place and essential elements of the crime to enable the defendants to prepare for trial and avoid a claim of double jeopardy.

*U. S. v. Weiss*, 491 F.2d 460, 466 (2d Cir. 1974) (citation omitted).

As recently as 1978, it has been held that an indictment which tracks the statutory language is specific enough to withstand a motion to dismiss. *U. S. v. Carr*, 582 F.2d 242, 244 (2d Cir. 1978).

Paragraphs 21 and 22 of Count Seven clearly track the language of 18 U.S.C. § 1962(a) and, as such, are sufficient to withstand the instant motion under the holding of *Carr*. *See also U. S. v. Cohen*, 518 F.2d 727, 732 (2d Cir. 1975). Moreover, the language of Count Seven as a whole is sufficient to inform the defendants as to the essential elements of the crime and they have more than sufficient information to enable them to adequately prepare for trial.[4] Consequently, the motion to dismiss Count Seven is denied.

**4. Motion to Dismiss on Grounds of Government Misconduct**

◼ In wholly conclusory terms, the defendants seek to dismiss the entire indictment on the grounds that "the government's dealings . . . reflect a continuing pattern of pervasive, aggravated, and unrepentant government misconduct." Notice of Motion in Support of Defendant's Motion to Dismiss on Grounds of Government Misconduct at 1. The only first-hand evidence in support of these allegations is the affidavit of Daniel Gamsin dated July 23, 1979 who testified before the grand jury.[5] At best, the charges in Mr. Gamsin's affidavit evince nothing more than a personality conflict between the witness and the prosecutor. Certainly, there is not sufficient evidence of misconduct to justify the drastic remedy of dismissal of the indictment.

In the recent case of *U. S. v. Fields*, 592 F.2d 638 (2d Cir. 1979), this Circuit has indicated that the relief granted by the Court should be in "proportion to the wrong sought to be corrected." *Id.* at 647. In outlining the test for dismissal based on government misconduct, the Court said:

> The extreme sanction of dismissal of indictment is justified in order to achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution, second, to 'help to translate the assurances of the United States Attorneys into consistent performances by their assistants.'

*Id.* (footnotes omitted).

Mr. Ostrer has not offered any proof of serious government misconduct and has certainly not shown prejudice resulting from such conduct. Nor has he shown that any

---

**4.** In it's brief, the government describes some of the proof it will use to show the necessary impact on interstate commerce. For example, the government intends to show that the office building owned by the 955 Corp. had a mortgage held by a Maine Insurance Company and that the building had several national corporate tenants themselves engaged in interstate commerce. Government's Memorandum at 101–03.

**5.** The notice of motion on this issue describes government misconduct directed at Louis Ostrer, his family, and business associates. For example, it is alleged that they were "harassed" and "frightened" so as to require Mr. Ostrer to co-operate in the "top echelon criminal informer" program. As noted above, it is again interesting to note that, despite these personal attacks neither Ostrer nor his family has submitted an affidavit.

assurances were made to him or that the prosecution has been less than consistent.

In sum, defendants' conclusory allegations and flimsy proof fall far short of the showing required for dismissal of this indictment or even for a hearing on the issue. For these reasons, defendants' motion to dismiss the indictment based on governmental misconduct is denied.

*Suppression Motions* [6]

1. Fruits of Illegal Searches and Seizures; Louis Ostrer's Immunized Testimony Before the Grand Jury.

Defendants further move to suppress and request an evidentiary "taint" hearing concerning the fruits of certain illegal wiretaps and evidence from New York State grand jury proceedings at which Louis Ostrer was granted transactional immunity. For the following reasons, a "taint" hearing on both issues, should it be necessary, will be held after completion of the trial.

■ On the illegal wiretaps issue, it appears that Louis Ostrer's business at 377 Fifth Avenue, New York, New York was subjected to electronic surveillance by New York State officials from October, 1972 until February, 1973. Following this surveillance, a search of these premises was conducted pursuant to a state search warrant and numerous documents were seized. The antecedent wiretapping which allegedly led to the surveillance of Ostrer's business was declared to be in violation of the Fourth Amendment by a New York State Court. *People v. Brown*, No. 1392–1973 (N.Y. Sup.Ct. Feb. 4, 1975). From this, defend-

ants' "anticipat[ed] . . . the inevitable ruling that the derivative tap on the Ostrer premises was likewise unlawful." Affidavit of Harvey Silvergate at 4 (July 23, 1979). This ruling never came about due to the District Attorney's successful motion to dismiss the indictment.[7]

It is argued by defendants that information leading to the February, 1973 search was obtained through the illegal wiretap. Consequently, any documents seized therein are tainted. Alleging that much of the government's case is tainted by these illegal searches and seizures, defendants request a pre-trial taint hearing. They do not, however, specify the evidence to be used which is tainted.

On the other hand, the government argues that it has erected a Chinese Wall around the concededly illegally obtained evidence and that it would have lawfully obtained the documents seized in February, 1973 in any event.

■ With regard to the immunized testimony argument, Louis Ostrer was apparently required to testify before a New York State Grand Jury. Much of this testimony allegedly concerned details of his financial affairs. Pursuant to New York law,[8] he was automatically granted transactional immunity.[9] Much of the government's case, argue defendants, is derived from this immunized testimony. They therefore request a pre-trial evidentiary hearing on this issue as well.

For reasons which apply equally well to the surveillance and immunized testimony

---

6. Many of the suppression motions are also labelled "motions to dismiss." Since none of the improprieties or constitutional violations alleged rise to a level sufficient to entertain a motion to dismiss, I shall deal with the motions in this portion of the Opinion as suppression motions.

7. Defendants, although recognizing my power to make my own determination on the legality of the searches and seizures request that I defer to the state court's declaration. This I cannot do, since there was no decision of a state court specifically declaring the surveillance and search of Ostrer's premises in violation of the Fourth Amendment. Thus, any Fourth Amendment questions will be resolved

at the post-trial evidentiary hearing, should such hearing be necessary.

8. N.Y.Crim.P.Law § 50.10(1) and § 190.40.

9. In this motion, Louis Ostrer claims that the transactional immunity granted to him by New York State should likewise apply to the federal government. This argument can be summarily dismissed. Although the federal government must grant *use* immunity to a witness granted immunity in the state courts, it need not grant full *transactional* immunity. *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

issues, I find that the ends of justice will best be served by conducting any necessary taint hearings after trial.

■ First, I must deal with a preliminary issue. The government argues in its brief that it has not had any access at all to the State grand jury transcript or the electronic surveillance logs.[10] Even if this is so, however, an affidavit to that effect is not sufficient to satisfy the government's burden to prove an independent legitimate source for evidence it wishes to use. A taint hearing at which the government establishes its independent source is necessary. *U. S. v. Nemes*, 555 F.2d 51 (2d Cir. 1977).

■ The timing of this hearing is the issue which I now address. Several reasons justify the holding of a post-trial hearing in this case. In *U. S. v. Birrell*, 269 F.Supp. 716, 727–29 (S.D.N.Y.1967), the Court carefully outlined various reasons for the propriety of a post-trial evidentiary hearing, the majority of which are applicable here.

First, defendants may be acquitted, obviating the need for any taint hearing at all.

Second, because the defendants have not pointed to specific evidence which is tainted, they seek to hold the government to its proof at a pre-trial hearing that *all* of the evidence to be used has an independent legitimate source. This of course, would likely result in a protracted evidentiary hearing much longer than the trial itself.

Third, at this stage, the specifics of the government's case are only tentative and, of course, its rebuttal case cannot yet be framed. It would be a waste of judicial time to require the government to make its showing now on evidence which may never be offered. Moreover, issues may come up at trial which are, at this time, unforeseeable. Proof offered by the government on these issues may well require a taint hearing during or after the trial. In the interest of efficiency, it is best to determine these issues at one time.

Fourth, criminal discovery is much more limited than civil discovery. The extensive pre-trial hearing suggested by defendants would give them an unfair preview of the government's case which would otherwise not be allowed.

Finally, it is likely that this case will attract extensive pre-trial publicity. This may, of course, prejudice defendants' right to a public and speedy fair trial.

For all of the above reasons, the motion to suppress the fruits of illegal searches and searches, and immunized testimony is hereby denied without prejudice. Similarly, the request for pre-trial preliminary hearings is denied. Should such hearings be necessary, they will be held after trial.

## 2. Internal Revenue Service Summonses

■ Pursuant to 26 U.S.C. § 7602, the Internal Revenue Service [hereinafter referred to as "IRS"] previously issued civil summonses concerning several of the tax years here in question. Defendants challenge the use of any evidence obtained through these summonses as they were for the "improper purpose of obtaining evidence for use in a criminal prosecution."

Very simply, defendants have not met their burden of disproving a valid civil tax summons so as to justify an evidentiary hearing on this issue.

In *U. S. v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the Supreme Court held that

those opposing enforcement of a summons do bear the burden to disprove the actual existence of a valid civil tax determination or collection purpose by the Service. After all, the purpose of the good-faith inquiry is to determine whether the agency is honestly pursuing the goals of § 7602 by issuing the summons.

Without doubt, this burden is a heavy one. Because criminal and civil fraud liabilities are coterminous, the Service

10. In fact, the prosecution was careful to immediately, without inspection deliver the surveillance logs to the Court when they were given to the prosecution as Defendants' Exhibit KK to the instant motions.

rarely will be found to have acted in bad faith by pursuing the former.

*Id.* at 316, 98 S.Ct. at 2367.

Defendants merely allege that there was an "apparent" working relationship between the IRS and the Justice Department Strike Force. An affidavit of counsel, for the most part "on information and belief," points to co-operation between IRS Agent Martin and the Strike Force. Affidavit of Harvey Silvergate at 8–10. Even if the allegations of co-operation are true, they are insufficient to challenge the civil tax summonses. Co-operation between or co-existence of IRS and Strike Forces in the investigation of organized crime is only natural and it does not necessarily follow that the IRS cannot remain autonomous. *U. S. v. Chemical Bank*, 593 F.2d 451, 454 (2d Cir. 1979).

In addition, according to recent Supreme Court cases, as construed in the *Chemical Bank* decision,[11] summonses issued prior to a recommendation for criminal prosecution will be held invalid only under unusual circumstances. The affidavit of John Ryan indicates that the vast majority of the summonses involved herein were issued prior to forwarding of the case to the Justice Department. Affidavit of John Ryan at 3–4 (September 17, 1979), Exhibit R to Government's Memorandum.

Of the three summonses issued *after* this point in time, one was never complied with. Thus, no information capable of suppression was ever obtained thereby. As to the others, they did not produce evidence which the grand jury did not already have access to. *Id.*

Moreover, there is no indication that the IRS was acting as a mere "conduit" for the Justice Department's criminal investigation. From the start, the IRS was interested in Ostrer's civil tax liability and this interest has not been abandoned.

In sum, defendants have not met the heavy burden of disproving the validity of the civil tax summonses. Thus, no evidentiary hearing is required.

■ 3. Stipulations in Connection with Tax Court Settlements

Prior to the instant indictment Louis Ostrer was a party to various civil tax proceedings in the Tax Court. Defendants argue that any stipulations entered into in connection with the settlement of these cases are "involuntary confessions" which must be suppressed at the trial of the instant indictment. In support of this contention, defendants rely on an alleged promise by the government that such stipulations or settlements would not be the subject of criminal prosecution. They further argue that the Tax Court applied severe pressure on Mr. Ostrer to settle and therefore the stipulations may not be reliable.

These allegations do not merit an evidentiary hearing, nor do they merit much discussion. There is simply no evidence of any government promise or trickery. Any alleged "pressures" imposed by the Tax Court Judge were no more than the ordinary suggestions of a trial judge who sees a case which is ripe for settlement.

Moreover, as stressed above, it is not the tax *liability* which Louis Ostrer is being tried for in the instant case; it is the evasion of *payment.* Any stipulations entered into in connection with the Tax Court settlements must necessarily go to the former. The defendant cannot stipulate or concede tax liability and then seek to suppress these concessions when it comes time to enforce them. An evidentiary hearing on this issue is hereby denied.

4. Louis Ostrer's Statements

While Louis Ostrer was on probation after a plea of guilty to various state charges, he made several statements concerning his financial affairs to IRS agents. Defendants contend that such agents' failure to

---

11. The Supreme Court cases interpreted in *Chemical Bank* were *U. S. v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); *Donaldson v. U. S.*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); *Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964).

administer *Miranda* warnings necessitates the suppression of these statements. This issue need not be decided at present because the government indicates that it has no plans to use such statements. Letter from Richard Ziegler, Assistant United States Attorney, to the Court at 13. (October 29, 1979). In any event, it is not at all clear that the situations described by defendants were "custodial interrogations" to which *Miranda* applies.

*Discovery Motions*

### 1. Grand Jury Minutes

Defendants, pursuant to Fed.R.Crim.P. 6(c) seek to inspect grand jury minutes and exhibits leading to the instant indictment. As support for such inspection, they generally reassert the argument previously discussed in connection with the motion to dismiss for government misconduct.

[11] It is well settled law that the disclosure of grand jury minutes to the defendant is discretionary with the trial judge. *Pittsburgh Plate Glass Co. v. U.S.*, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959). In exercising that discretion, the judge must balance the defendant's claim against the well-established policy of secrecy for grand jury proceedings.

Moreover, "the burden, . . ., is on the defense to show that 'a particularized need' exists for the minutes which outweighs the policy of secrecy." *Id.* at 400, 79 S.Ct. at 1241. I find that defendants have not shown a "particularized need" for inspection of the grand jury minutes. In the interest of justice, however, the government is directed to deliver such minutes to the Court for *in camera* inspection. After reviewing these minutes, I can determine whether or not there is any evidence of improper grand jury procedure and thus avoid prejudice to either party to this action.

### 2. Bill of Particulars

Requests for a bill of particulars pursuant to Fed.R.Crim.P. 7(f) have been substantially complied with by the government. This opinion, therefore, will discuss only those which remain disputed. Again, it should be noted that the scope and specificity of the bill of particulars is within the discretion of the trial judge. *U.S. v. Tramunti*, 513 F.2d 1087 (2d Cir. 1977).

The request for specific dates on which each defendant and co-conspirator joined the conspiracy is denied. It is clear from the case law that the government is not required to furnish such information. On precisely this issue, the Court in *U.S. v. Lannelli*, 53 F.R.D. 482 (S.D.N.Y.1971), indicated that

> the defendant seeks a statement of "the dates or date, times and places of the making of the alleged conspiracy." It has been held that the Government is not required to furnish the exact date of a conspiracy agreement. . . . Generally, the particulars as to the formation of a conspiracy need not be set forth by the prosecution. . . . The details of the creation of the conspiracy are not necessary either to allow the defendant to prepare his defense or to plead double jeopardy.

*Id.* at 483 (citations and footnote omitted).

With the following limited exceptions, the remaining requests for particulars, not already complied with, are denied as impermissible discovery of details of the government's case. The government is hereby directed to furnish the names of those present at a joint meeting of the Trustees attended by Louis Ostrer and Seymour Greenfield (request number 28) and the names of officers who attended the mortgage closing with Louis Ostrer. (request number 36).

### 3. Statements of Co-Defendants

Pursuant to Fed.R.Crim.P. 14, the government is directed to furnish any statements of co-defendants of Louis Ostrer which it now intends to use at trial to the Court for *in camera* inspection.

### 4. Electronic Surveillance and Grand Jury Orders

Apparently, defendants have already had access to the electronic surveillance log of

Ostrer's premises as it is furnished to the Court as Exhibit KK to the instant omnibus motion. The government claims that it did not have access to this log and it knows of no other surveillance concerning the defendants herein.

As for the orders convening and extending the grand jury, these have been made available as Exhibit V to the Government's Memorandum.

5. Defendants' Statements

 The government has complied with the vast majority of defendants' requests for discovery pursuant to Fed.R.Crim.P. 16. It declines, however, to give the contents of defendant Louis Ostrer's oral statements to third parties. Pursuant to the terms of Fed.R.Crim.P. 16(a)(1)(A), the government is required to turn over "the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent." Such statements have already been or will be furnished. Discovery of oral statements to third parties is not provided for in Rule 16. Authority for such pre-trial discovery is also lacking in 18 U.S.C. § 3500. Consequently, defendants' request for oral statements made to third parties is denied.

*Severance Motion*

 Pursuant to Fed.R.Crim.P. 8(a) and 14, defendants move for a severance of defendant Louis C. Ostrer from the other defendants as well as a severance of Counts One and Two from the other five counts.

This is not the first of such motions in the instant case. Last year, defendants Rita Ostrer and Seymour Greenfield similarly moved for severance on grounds of misjoinder under Fed.R.Crim.P. 8. In *U.S. v. Ostrer*, 460 F.Supp. 1388 (S.D.N.Y.1978), I decided that both the offenses and defendants were properly joined. The reasoning of that Opinion applies equally as well to the instant motions. Thus, the Rule 8 motion for severance is denied.

Even where joinder is proper under Fed. R.Crim.P. 8, defendant may move for a discretionary severance under Fed.R. Crim.P. 14. In my prior Opinion, I "defer[red] consideration of a Rule 14 motion until such time as defendants choose to make a proper showing." *Id.* at 1391.

Defendants have not now made such a showing. Recent Second Circuit opinions have held that

> The burden is upon a moving defendant to show facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial.

*U.S. v. Rucker*, 586 F.2d 899 (2d Cir. 1978).

In exercising my discretion pursuant to Rule 14, I must balance

> the benefit to the government in trying related incidents and individuals together against the prejudice to a defendant of possibly having multiple offenses and participants confused with each other.

*U.S. v. Luna*, 585 F.2d 1, 4 (1st Cir. 1978). Where, as here, the number of defendants and number of counts is small, and the issues are interrelated and not excessively complex, the jury will be able to distinguish among defendants and offenses with proper instruction. Defendants have not met the burden of showing such a severe prejudice that the balance should tip otherwise. Accordingly, the Rule 14 motion for severance is denied.

*Surplusage in the Indictment*

A motion was made pursuant to Fed.R. Crim.P. 7(d) to strike references to aliases and surplus language such as "among others" and "including, but not limited to".

 Defendants cite *U.S. v. Grayson*, 166 F.2d 863 (2d Cir. 1948) in support of their contention that prejudicial reference to aliases should be stricken. It should be noted that in *Grayson*, the alias used in the indictment was the defendant's former name which had been legally changed. Moreover, the alias had no relevance to the crime charged in the indictment. More recently, the Second Circuit has indicated

the limitations of the *Grayson* opinion. In *U. S. v. Miller*, 381 F.2d 529 (2d Cir. 1967), the appellant had similarly cited *Grayson* "as condemning the use of aliases in indictments. But the disapproval expressed in [that] opinion is limited to cases where the alias is without relevance . . . ." *Id.* at 536.

Here, unlike the situation in *Grayson*, the aliases are relevant. It is alleged in the indictment that, as part of a scheme to evade payment of taxes, various bank accounts were opened in fictitious names. It is these names which are properly used in the indictment.

■ As for the other claims of surplusage, such language will not be stricken unless

> the words sought to be stricken as surplusage are immaterial, irrelevant or apt to convey prejudicial or inadmissible material to the jury.

*U.S. v. Chovanec*, 467 F.Supp. 41, 45 (S.D.N.Y.1979). As a general rule, if such language appears in the means paragraph, it is upheld but stricken if it is in the gravamen paragraph. *U.S. v. Mayo*, 230 F.Supp. 85 (S.D.N.Y.1964); *U.S. v. Pope*, 189 F.Supp. 12 (S.D.N.Y.1960).

■ In the instant indictment, the language complained of appears in paragraphs which are clearly denominated as including only "means." Moreover, defendants have not shown any specific prejudice which would result from a failure to strike such language. Accordingly, the motion to strike language from the indictment is denied.

Except as specifically provided above, all of defendants' motions in the instant omnibus motion are denied.

SO ORDERED.